GEORGE B. MINER, Complainant, Appellant,

*vs.*

JOHN W. MEDBURY, Defendant, Appellee.

APPEAL IN EQUITY FROM MILWAUKEE CIRCUIT COURT

A party selling property is presumed to know whether the representation he makes of it, is true or false.

If he know it to be false, it is a positive fraud; if he does not know it to be true, it is evidennce of a culpable negligence on his part which in equity amounts to a fraud.

When a sale is made of property not present, but at a remote distance, which the seller knows the purchaser has never seen, but which he buys upon the representation of the seller, relying upon its truth, the seller is bound to make good the representation.

In such a case, if the seller was simply mistaken, and the mistake was in a material point, and the purchaser having taken the property on the faith of the representation, the seller is liable for a misrepresentation, and the contract may be rescinded as for a fraud.

*Quere*: as to the effect of an answer *on oath*, where the oath is expressly waived by the bill?

The appellant filed his bill in equity in the circuit court of Milwaukee county, setting forth, among other things, that in the month of November, then last, (1855), and before the execution of the contracts therein set forth, he entered into negotiation and had conversations with the appellee relative to the purchase of his interest, being one-sixth part, in the firm of Aldrich, Smith & Co., of Two Rivers, Manitowoc county, Wisconsin, during which conversations the appellee represented to the appellant that said Aldrich, Smith & Co. were doing a large and prosperous business, and possessed of a large amount of property, both real and personal. More particularly he represented "that said firm of Aldrich, Smith & Co., of which firm said Medbury was a member, owned betwen seven thousand and eight thousand acres of land lying in the county of

Manitowoc, and subsequently when the contract hereinafter mentioned was executed, it was mentioned in said contract as being from five to eight thousand acres. That before the execution of said contract and as an inducement to your orator to purchase, said Medbury represented to your orator that said lands were good pine lands, and that from more than one-half of them no pine timber or none of any consequence had been cut, or words in substance to that effect.

That said firm also owned saw-mills in said Manitowoc county and on the lands hereinafter described. That he, said Medbury also represented to your orator that said firm owned from five hundred to six hundred village lots in the village of Two Rivers in said county of Manitowoc, and that at least sixty of these lots were river lots worth about $500 each, and that all said real estate was free from incumbrance except a mortgage of about $500.

That said Medbury further represented to your orator that said mills had cut in addition to what had been sold at retail at the mills and sold and carried to other places than Chicago in the season of 1855, about 9,000,000 feet of lumber, which had been carried to Chicago, Illinois, and there sold for twelve dollars per thousand feet, and said Medbury went into particulars in this respect and stated how much each of the vessels, belonging to or in the employ of said company, had carried, which several amounts when footed up made eight million, nine hundred and thirty thousand feet of lumber, and said Medbury assured your orator that this statement or representation was substantially correct, and also that said firm had sold said lumber for twelve dollars per thousand feet, and that said company had for the past season cleared net profits on said lumber between fifty-three and fifty-four thousand dollars, and that such were the profits of said company, that in three years time your orator would receive profits equal to his whole purchase money, or to use the precise language of said Medbury, " the property would in three years pay for itself."

The bill further charges that Medbury, during these conversations, represented that there would, in a few days, be a divis-

ion of the profits of said firm, among its members, to the amount of $30,000, and in which the appellant would share, if he made the purchase, and by which the appellant would receive back $5000, which he could apply toward payments. And this division of the $30,000 he at different times and in divers ways impressed upon and urged to your orator during said negotiations as a reason why your orator should purchase said personal property, and upon such representation your orator relied. And such representation your orator charges was false and known to be so by said Medbury. And no such or similar division of the profits of said company has ever been made, and your orator on his belief charges that there was not $90,000 worth of personal property over and above enough to pay the debts of said firm or any where near that sum.

And your orator also charges that in truth and in fact said mills did not cut in all including lumber sold at the mills at Chicago and elsewhere, nine million feet of lumber in the season of 1855. And that of the lumber so cut there was sent to Chicago only about 6,000,000, feet, which was sold at $12 per thousand feet, and your orator believes less than that amount of lumber, and about 1,500,000 feet of lathe, which was sold at something less than five dollars per thousand feet, and it is not and was not true that the profits on the said lumber sent to Chicago were $53,000, or any where near that amount, as your orator believes and charges.

That said Medbury also represented that there was pine timber sufficient on said lands to cut ten million feet of lumber every year for ten years.

And said Medbury further represented to your orator that the personal property of said firm was worth ninety thousand dollars over and above all indebtedness.

That your orator went to Two Rivers, but not till after executing the contracts herein mentioned, for the purpose of seeing said property, but on account of ill health, when there, did not go to view said property, except the mills, and left with an understanding that an inventory of the property of said company should be sent to him. And your orator being assured

by said Medbury that all his representations relative to said company's property (being those hereinbefore set forth and many others) were true, and your orator confiding in such representations and having at that time great confidence in said Medbury as a man of truth, made with said Medbury an agreement in writing, in and by which said Medbury agreed to sell to the appellant all of his interest in all of the real estate owned by, and belonging to, the said firm of Aldrich, Smith & Co., consisting mainly in from five to eight thousand acres of land, more or less, from four to six hundred village lots, in the village of Two Rivers, more or less, and saw mills situated on said land or lots, and the pier extending into lake Michigan at Two Rivers, which interest was one undivided sixth part of all the real property of said firm lying in Manitowoc county, for the sum of twenty-five thousand dollars; and said Medbury agreed to execute a proper conveyance of said property to appellant, free of incumbrances, &c., on or before the 10th day of January then next, at his own expense, &c.

And the said Miner, on his part, agreed to pay for said property, said sum of $25,000, in manner following: $6,250 in land; and on the delivery of the deed to him by Medbury for said lands, to execute to said Medbury his bond in the penal sum of $25,000, conditioned for the payment of the balance of the purchase money, $18,750, in three equal annual installments, with seven per cent. interest payable annually; said bond to be secured by a mortgage on the property sold. This embraces the substance, and the material parts of the agreement, which is recited at length in the bill.

That the interest in the personal property represented by Medbury in said firm of Aldrich, Smith & Co., was at the same time, and as a part of the same transaction, contracted in a separate contract then also executed by the parties, at an inventory and appraisment to be thereafter made, as provided by the agreement also copied into the bill.

The appellant charges that there has been an alteration in the contract, without his knowledge, whereby the number of villlage lots has been changed from "five to six hundred," to from "four to six hundred," as it now reads.

The bill further alleges that the appellant did pay at the time of the execution of said contract, said sum of $6,250, which was endorsed on the contract; and also the sum of $750, which was endorsed on the contract for the personal property; and that he subsequently paid said Medbury the sum of $1000, to apply on account of the personal property, making in all the sum of $8,000, which he has paid said Medbury.

The bill also alleges that the said real estate bargained in said contract, was not, at the time of making said agreement, worth the sum of $25,000, or more than half that sum. That said statements and representations made by said Medbury respecting the same are false. That it is not true that from one-half of said lands, represented as pine lands, no pine timber, or none of any consequence, had been cut at the time of such representations, " as your orator is informed and believes, and charges the fact to be; but on the contrary, he is informed, and on his information and belief charges, that most of said lands, in fact nearly all, are nearly stripped of their pine timber, and by far the most valuable portion of the pine has been cut on nearly all of said lands.

That it is not and was not true in November last, that said firm owned between five hundred and six hundred village lots in the village of Two Rivers. And it was not then true that the said firm owned sixty river lots in said village, worth $500 each, or near that number as your orator is informed, believes and on his belief charges. And said company then owned only about 30 river lots and those worth on the average only about $100 apiece as he believes and on his belief charges.

That it is not and was not true in November last as represented by said Medbury that said Mills had cut and there had been carried away from them the past season and sold nine millions of feet of lumber, or any where near that quantity, as your orator is informed, believes and charges. And he is informed and on his information and belief charges the fact to be that said mills did not last season, that is the season of 1855, cut five million, five hundred thousand feet of lumber or thereabouts.

"That it is not and was not true in November last, that said company had cleared net profits during the season preceding as represented by said Medbury to the amount of $53,000 or $54,000 as your orator is informed and believes and charges the fact to be, but on the contrary, your orator on his information and belief charges the fact to be that the net profits of said company for the season of the year 1855 were very small, little or nothing, and he believes nothing. And that said property would not pay for itself in three years at the price of such purchase, and as your orator believes and on his belief charges, it would not in twenty times that period of time.

That it is not and was not in November last true that there was pine timber sufficient on said lands to cut ten millions feet of lumber every year for ten years, as your orator is informed, believes and charges, and your orator charges on his belief that there was not then one-half or near one-half that amount of timber on said lands. That it is not and was not true in November last, as represented by said Medbury, that the personal property of said firm was worth $90,000 over and above all debts then owing by said firm as your orator is informed and believes and charges the fact to be. And on the contrary, he is informed, believes, and on his information and belief charges the fact to be that said firm was then indebted to the amount of about $40,000, and that said personal property of said firm was not then worth more than $50,000, and your orator believes less than $50,000.

Your orator on his information and belief charges that the personal property of said firm is not and was not in November last worth more than sufficient to pay the debts of said firm.

And your orator is advised and charges on his information and belief that said firm made no dividends the past year and instead of being in a thriving and prosperous condition in November last, were really embarrassed or in such condition that it is or may be necessary for the individual members of said firm to advance money or put in more capital to enable it to carry on its business.

And your orator on his belief charges that said Medbury

knew at the time he made such representations that they were false as they were in fact, and your orator charges that said contracts were obtained from him by false and fraudulent representations, and are fraudulent and void and ought to be rescinded, cancelled and annulled.

And your orator further states that he was not and is not acquainted with the lumbering business in which said firm is and was engaged, and placed great confidence in the representations of said Medbury so made as aforesaid.

And that as soon as he became satisfied that said representations were materially false and fraudulent, he sought said Medbury and has had several conversations with him in hopes to arrange the matter amicably, but has entirely failed so to do."

The bill prays an answer, but expressly waives an answer on oath ; and that the contracts may be rescinded, declared void, cancelled and annulled ; and that a personal decree may be rendered against Medbury for amount of the purchase money so paid and costs ; and that he may be restrained from bringing any action at law upon the contracts or either of them, &c., and for general relief.

The defendant answered, and verified his answer by his oath, although a sworn answer had been waived in the bill. He admits holding the conversations and negotiations with the complainant previous to making the contracts set forth in the bill ; but denies that he represented to complainant that said firm of Aldrich, Smith & Co. owned between seven and eight thousand acres of land, but insists that in all of such conversations and negotiations relative to the sale of the lands, he informed the complainant that he did not certainly know the exact quantity of land owned by the firm, but that the amount was between five and eight thousand acres. He denies that he represented to complainant that said lands were good pine lands, and that from more than one-half of them, no pine timber, or none of any consequence, had been cut ; or that he used words to that effect, during said negotiations. Denies that he ever represented to the complainant that the said firm owned

from five to six hundred village lots in the town of Two Rivers, or that at least sixty of said lots were river lots, worth five hundred dollars apiece ; but insists that he always represented that said firm owned from four to six hundred village lots in said Two Rivers, and that a portion of said lots were river lots, and valuable. Denies that he represented said saw-mills as having cut, or that there had been carried away from there, during the season of 1855, nine millions of feet of lumber; denies that he made any representations as to the profits of the business, or that he represented to said complainant that there was pine timber upon the lands owned by said firm sufficient for ten millions of feet of lumber to be cut therefrom every year for ten years. Avers that during all the negotiations with complainant for the sale of the property to him, he informed the complainant of the situation and position of the property so far as he knew about the same, and of his means of knowledge in relation to the amount and value thereof, and that it was expressly understood and insisted upon that said complainant should himself make an examination and personal inspection of said property, before any contract therefor should be made. He says that he and the complainant did start, in the month of November, 1855, to go to Two Rivers to examine the property, that complainant might judge for himself of the character and value thereof; but that by reason of strong winds, the boat upon which they were embarked, could not land at Two Rivers, and they were carried by that place, and were landed at Green Bay ; from which place defendant urged complainant to proceed by land with him to Two Rivers, but that complainant declined to do so, and returned to Milwaukee without seeing the property.

Defendant avers that after complainant's return to Milwaukee, he expressed himself satisfied with the property and ready to enter into contracts, which was accordingly done, as stated in the bill; but that the two contracts were separate and distinct transactions, and not dependent on each other. The defendant denies at great length, all the charges in the bill, of the representations made by him before the sale, and in fact,

puts in issue the several matters relied on by complainant as grounds for asking said contracts to be rescinded.

The testimony of the case is exceedingly voluminous, too much so to admit of its insertion here; nor is it necessary, inasmuch as so much thereof as relates to the points adjudicated, and on which the finding of the court is based, is sufficiently stated in the opinion. The facts found, from the evidence, and the conclusions of law based thereon, are all that are deemed essential in the report.

*Emmons and Vandyke* and *J. Downer* for appellant.

To the question as to the effect of an answer *on oath* where the bill expressly waives an answer on oath, cited *Bartlett vs. Gale*, 4 Page Ch. Rep., 503; *Willis vs. Henderson*, 4 Scammon, 13; *Patterson against Gaines*, 6 How. U. S. Rep., 550; 2 Barb. Chy. Rep., 582.

Upon the question of misrepresentation in the making of the contract and the materiality of the representations made, they cited *Smith vs. Richards*, 13 Pet., 26, and cases there cited, and *Perkins vs. Rice*, 6 Litt., 218.

*Butler, Buttrick and Cottrill* for appellee.

Whether the complainant availed himself of information which was within his reach, or not, a court of equity will not relieve him. The rule *caveat emptor* applies, and it matters not how many representations were made, or how material or false they were. 1 Story's Eq. Juris., sec. 200; *Hough vs. Richardson, et al.*, 3 Story's R. 659—see page 690, et seq.

It is equally a rule of courts of equity and of Law, that fraud is not to be presumed, but must be proved. 1 Story's Eq. Juris., § 190.

To justify an interposition of a court of equity, it is not only necessary to establish the fact of misrepresentation, but that it is in a matter of substance, or important to the interests of the other party, and that it actually does mislead him. Ib., § 191. And the party must have been misled to his prejudice or injury; for courts of equity do not, any more than courts of

law, sit for the purpose of enforcing moral obligations, or cor-recting unconscientious acts, which are followed by no loss or damage. Id., § 203; *Vernon vs. Keyes*, 12 East. R., 632. A court of equity requires stronger reasons for setting aside a contract than would be sufficient to warrant it in denying specific performance. *Seymour vs. Delancy*, 3 Cow., 445 515, 518. There are many cases in which a court of equity will neither decree a specific performance, nor set aside the con-tract. *Hepburn vs. Dunlap*, 1 Wheaton R., 179; Willard's Eq. Jur., 263 and cases there cited.

A mistaken opinion of the value of property, if honestly entertained and stated as opinion merely, unaccompanied by any untrue assertion of fact, can never be considered as a fraudulent representation. *Hepburn vs. Dunlap*, 1 Wheaton R., 189; 1 Story's Eq. Juris., sec. 197. A court of equity requires the clearest proof of fradulent representations; and it must appear affirmatively that the contract was based on them before it will annul it. *Hough vs. Richardson*, 3 Story, 659–690, et seq.

*By the Court*, COLE, J. The bill in this case was filed to res-cind and set aside two contracts, made and executed on the 28th day of November, 1855, between the appellant and appellee, for the purchase and sale of the latter's interest, being an undivided one-sixth part of certain real and personal prop-erty belonging to the firm of Aldrich, Smith & Co., a firm largely engaged in manufacturing lumber and in merchandis-ing, at Two Rivers, Manitowoc county, and in the transporta-tion and sale of lumber thus manufactured, at Chicago. The entire interest of the appellee in all the property and business was sold, and the consideration for the real estate was twenty-five thousand dollars; one quarter paid down and the remain-der was to be paid in three equal annual instalments, to be secured on bond and mortgage, as specified in the contract. The appellant never went into possession of the property, nor gave the bond and mortgage, but filed his bill on the 14th of

April, 1856, to have the contract rescinded and declared void and surrendered, and for a personal decree against the appellee for the money paid, interest and costs. Upon the hearing, the circuit court dismissed the bill, with costs in favor of the appellee. The real estate sold consisted mainly of from five to eight thousand acres of pine land in Manitowoc county, and from four or five to six hundred village lots in the village of Two Rivers, and saw mills situated thereon, a pier extending into Lake Michigan, and of personal property consisting of a stock of dry goods, groceries, horse and ox teams, wagons, sleds, provisions, ready made clothing, &c., being the necessary chattels used by said firm in carrying on the different branches of business in which they were engaged, in the county of Manitowoc, and elsewhere. The bill charges that these contracts were entered into upon grossly fraudulent representations made by the appellee, as to the true character of the land, the quantity and quality of the pine timber thereon, and untrue and erroneous statements as to the extent and value of the business of the firm—representations and mis-statements which were relied upon and confided in by the appellant, and constituted his chief inducement for entering into these contracts. The bill further charges that there was an alteration in the contract, in a material point, for the sale of the real estate, after the same was executed, by changing the clause of the contract reading as is alleged at the time it was made, " from *five* to six hundred village lots, so as to make it read " from *four* to six hundred village lots." It would be extending this opinion to an unnecessary length to recapitulate all the allegations of fraud contained in the bill, and the denials in the answer thereto, or to go into a detailed examination of the evidence taken to show that there had been an alteration of the contract, and that the appellee grossly exaggerated and misrepresented the amount of lumber sales in 1855, and the profits of the business of the firm for that year; and we shall confine our attention entirely to the allegations, denials and proofs of misrepresentations as to the quantity of pine timber upon the pine lands.

" The appellant charges in his bill, that before the execution " and delivery of the contract or contracts between your ora- " tor and said Medbury, hereinafter mentioned, he entered " into negotiation, and had conversations with said Medbury, " relative to the purchase of his interest (being one sixth,) in " the firm of Aldrich, Smith & Co., of Two Rivers, Manito- " woc county, Wisconsin; and during such conversations and " negotiations, said Medbury represented to your orator that " said Aldrich, Smith & Co., were doing a large and pros- " perous business, and possessed of a large amount of property, " both real and personal. More particularly he, said Medbury, " represented to your orator that said firm of Aldrich, Smith " & Co., of which firm said Medbury was a member, owned " between seven thousand and eight thousand acres of land, " lying in the county of Manitowoc; and subsequently when " the contract hereinafter mentioned was executed, it was men- " tioned in said contract, as being from five to eight thousand " acres. That before the execution of said contract, and as an " inducement to your orator to purchase, said Medbury repre- " sented to your orator, that said lands were good pine lands, " and that from more than one half of them, no pine timber, " or none of any consequence, had been cut, or words in sub- " stance to that effect. That said firm also owned saw " mills in said Manitowoc county, on the lands hereinafter " described."

" And your orator being assured by said Medbury, that all " his representations relative to said Company's property, " (being those hereinbefore set forth and many others), were " true, and your orator, confiding in such representations, and " having, at that time, great confidence in said Medbury, as " a man of truth, made with said Medbury, and executed and " delivered, the agreements hereinafter set forth, that is to " say agreements in substance as follows, (except the altera- " tion hereinafter mentioned.)"

Again, the bill alleges, " That it is not true that from one " half of said lands, called or represented as pine lands, no " pine timber, or none of any consequence, had been cut at

'the time of such representations; as your orator is informed "and believes, and charges the fact to be, that on the contrary "he is informed, and on his information and belief charges, "that most of said lands, in fact nearly all, are nearly stripped "of their pine timber, and by far the most valuable portion of "the pine has been cut on nearly all of said lands. That it is "not, and was not, in November last, true that there was pine "timber sufficient on said lands to cut ten millions feet of lum- "ber every year for ten years, as your orator is informed, "believes and charges, and your orator charges, on his belief, "that there was not then one half, or near one half of that "amount of timber on said lands."

"And your orator, on his belief, charges that said Medbury "knew at the time he made such representations, that they "were false, as they were in fact; and your orator charges that "said contracts were obtained from him by false and fraudu- "lent representations, and are fraudulent and void, and ought "to be rescinded, cancelled, and annulled."

The above allegations are all that we deem it necessary to refer to in order to understand the ground upon which our decision is placed.

The defendant, in his answer, distinctly denies that he rep- resented to the appellant that said lands were good pine lands, and that from more than one half of them no pine timber, or none of any consequence had been cut; or that he used words to that effect during the negotiations. He says that at the time of the negotiations, between the appellant and himself for the sale and purchase of the appellee's interest in said firm, the appellee informed the appellant of the situation and position of said property, so far as he knew about the same, and of his means of knowledge in relation to the amount and value thereof, and of the business of the firm; and that it was at all times expressly understood and insisted upon that the appellant should himself make an examination and personal inspection of the property before any contract should be made. He further states that he never claimed to have, or gave the appel- lant to understand that he had, any accurate knowledge of the

precise value of said property, either real or personal, but that the statements made by him were only *data* from which the appellant was to make his own examination, and satisfy himself, by examination, in regard to the amount and value of said property, before the completion of any contract for the purchase and sale of the appellee's interest therein.

It is proper to remark that the bill waives an answer under oath, and yet the answer put in was on oath. Whether any greater effect can be given to this answer than to hold that it merely performs the office of a pleading, distinctly and fully putting in issue all the allegations of the bill, we will not stop to inquire. For, conceding that the general rule applies to this case, that the answer cannot be overcome except by the evidence of two witnesses, or one witness, sustained by strong corroborating circumstances, and still our conclusions upon the case must be the same.

The principles of law which apply to, and govern this case, are accurately and comprehensively stated by Justice Story in in his work on Equity Jurisprudence, section 191, as follows: " One of the largest classes of cases in which courts of equity are " accustomed to grant relief, is when there has been a misre- " presentation, or *suggestio falsi*. It is said indeed to be a " very old head in equity, that, if a representation is made to " another person, going to deal in a matter of interest, upon " the faith of that representation, the former shall make that " representation good, if he knows it to be false. *Evans vs.* " *Bicknell*, 6 Ves., 173, 192. To justify, however, an inter- " position in such cases, it is not only necessary to establish " the fact of misrepresentation, but that it is in a matter of " substance, or important to the interests of the other party, " and that it actually does mislead him. For if the misrepre- " sentation was of a trifling or immaterial thing, or if the " the other party did not trust to it, or was not misled by it, " or if it was vague and inconclusive in its own nature; or if " it was upon a matter equally open to the inquiries of " both parties, and in regard to which neither could be pre- " sumed to trust the other, in these and the like cases, there

"is no reason for a court of equity to interfere to grant relief "upon the ground of fraud." Again he says, "Whether "the party thus misrepresenting a material fact knew it to be "false, or made the assertion without knowing whether it "were true or false, it is wholly immaterial; for the affirma- "tion of what one does not know or believe to be true is "equally in morals and law, as unjustifiable as the affirmation "of what is known to be positively false, and even if the party "innocently misrepresents a material fact by mistake, it is "equally conclusive, for it operates as a surprise and imposi- "tion upon the other party." See the cases of *Neville vs.* "*Wilkinson*, 1 Brown Chan. Cases, 546; *Pearson vs. Morgan*, 2 Id., 385; *Felton's Executors vs. Rosevelt*, 5 John. Chy. Rep., 174; *McFerran vs Taylor et. al.*, 3 Cranch., 281; *Smith vs. Richards*, 13 Peters, 26; *Tyler vs. Black*, 13 How. R., 230; *Daniel vs. Mitchell*, et. al., 1 Story's R., 172; *Sherwood vs. Salmon*, 5 Day, 439; 2 Kent's Com., sec. 39; Willard's Eq. Juris, 148. In reference to these authorities, and their bear- ing upon the case at bar, we adopt, as most appropriate, the language of the court in the case of *Smith vs. Richards*: "The "principles of these cases we consider founded in sound "morals and law. They rest upon the ground that the "party selling property must be presumed to know whether "the representation which he makes of it is true or false. If "he knows it to be false, that is fraud of the most positive "kind; but if he does not know it, then it can only be from "gross negligence; and in contemplation of a court of "equity representations founded on mistake, resulting "from such negligence, is fraud." Keeping in mind these generally recognized and well settled principles of law, and how does this case stand? Does the evi- dence in the case show that representations were made by the appellee to the appellant, at the time the contract was entered into, as to the quantity of pine timber upon these lands, representations which were untrue or grossly exagger- ated, calculated to deceive and mislead the appellant, and which were material, constituting an inducement or motive

for making the contracts, and which now ought to avoid and rescind them on the ground of fraud? After an examination of the evidence, with much care, I have come to the conclusion that this last question must be answered in the affirmative. And first in order, let us inquire whether any representations were made by the appellee to the appellant, as to the amount of pine timber upon the pine lands. The witness, Joshua La Due, testifies as follows:

"I know the parties in this suit, I drafted the contracts set "forth in the bill of complaint in this cause. Mr. Miner came "to my office and got me to go over to his office, and there I "found Mr. Medbury. This was on the 27th day of Novem- "ber last, the contract was drawn that night and signed, and "dated the next day, which was the 28th day of November. "When at the office of Dr. Miner, as I before stated, on the "27th day of November, I found Mr. Medbury there. Dr. "Miner was also there. Mr. Miner went on to state to me, in "the presence of Mr. Medbury, as to the kind of a contract "which they wanted me to draw, and Mr. Medbury assented "to what Dr. Miner said. Mr. Miner took out of his pocket "book, the same book Dr. Faries, the former witness spoke of "yesterday, and which is herewith returned, from which book "Dr. Miner gave me the foundation of the contract, with "instructions how the contract should be drawn, together with "the *data* as to the amount of real estate, and village lots and "land. I am confident Dr. Miner stood by me with the book "open at the place from which this statement was given by "Mr. Faries, and copied with his deposition, and went on to "give me directions how to draw the contract, taking as I sup- "posed the *data* of the amount of lands and village lots from "that book. I gathered from their conversation at the time, that "Mr. Miner had not seen the land and lots he was buying of "Mr. Medbury at Two Rivers, and I asked him if he was buy- "ing that property without ever having seen it. Mr. Miner "answered by giving me a history of the trip, when they "started to see it, and having failed, and said that Mr. Med- "bury told him so and so. Mr. Miner said that Mr. Medbury

" told him there were between seven and eight thousand acres
" of pine lands, scattered over Manitowoc county, and belong-
" ing to Aldrich, Smith & Co., of which he (Medbury) owned
" one sixth, and that there were between five and six hundred
" village lots, and that there were two saw mills situated on
" some of those lots, and a pier extending into Lake Michigan,
" with a warehouse standing on the foot of it ; and from the
" talk between them there, the pier was called worth from
" eight to ten thousand dollars ; all this that was told me by
" Dr. Miner, was done in the presence of Mr. Medbury, who
" was standing by at the time I was receiving instructions how
" to draw up the contract, in Dr. Miner's office; and when
" Mr. Miner came to speak of the pine lands, Mr. Medbury
" said that the most of them was covered with fine pine tim-
" ber, but some of the lands had the timber partially taken
" off."

Further on, the witness testifies in answer to a question as to
what was said at this conversation, (if anything,) relative to
this purchase being made by the complainant upon the repre-
sentation of the defendant, that " The complainant followed
" this statement right up, by saying that Mr. Medbury told
" him the property was so and so, and if it was such as Mr.
" Medbury said it was, he was willing to take it, and that he
" took it on the representations of Mr. Medbury. Mr. Med-
" bury was standing by, and said to Mr. Miner, that he would
" find the property was even better than he had represented it."
The character of this witness for truth and veracity stands
unimpeached, and his evidence shows clearly and satisfactorily
to my mind that the appellee had represented the timber lands
to contain fine pine timber, an inconsiderable part of which
had only been cut off. Among the data in the memorandum
book, is this entry : " 7000 acres of pine land, $10 per acre."
This circumstance is slight, to be sure ; but it indicates what
representations had been made by the appellee during the
negotiations as to the character of these lands, and what timber
was on them. Some remarks were made by the counsel for
the appellee, on the argument, to the effect that it did not

clearly appear from the evidence that the data in the memorandum book were furnished by the appellee, and were intended and understood by the parties to be substantially correct, and constitute the basis of the contract. But the question naturally arises, how did the appellant obtain the data in the memorandum book, if not from the appellee? And when the appellant was directing La Due as to the drawing up the contract, and referred, in the presence of the appellee, to these data as the foundation of the contract, is it not extraordinary that the appellee did not interpose, and say that the data were not reliable, and did not contain a true statement of the representations made by him, if he had not furnished them? But there is other testimony in the case, full, clear, and positive, to show that the data were furnished by the appellee as the basis of the contract. The witness, Faries, swears that in January, after the contract was entered into, the appellee was in the office of the appellant, (which was also occupied by the witness,) and the appellant said, speaking of the mill property, that it was not what it was represented to be at the time of the trade; and that the appellee contended that it was; when the appellant took from his pocket this memorandum book, and opened to a statement, and told the appellee: "Here are the data which "you gave me to go upon, at the time of purchase;" that the appellee took the book and looked at it at the place where it had been opened, and said something like this: "Yes, you "will find these statements substantially correct." Some criticism has been passed upon the testimony of this witness, and it is contended that it is not reliable, since it appears that the memory of the witness is greatly at fault as to the time this conversation occurred. The witness might have been, and probably was, mistaken as to the time this conversation occurred; but we do not see how he could have been mistaken as to the fact of hearing such conversation, and the impression which it left upon his mind. Besides, he says the appellant showed him the book, (which he identifies,) immediately after the appellee left the room. How is it possible for him to be mistaken about such a circumstance? If he did not hear such a conversation

at some time, substantially as he stated in his testimony, he must know it, and he has committed wilful perjury. Now it is from this evidence that we are led to the conclusion that the appellee did represent that the lands were fine pine lands, with the timber but partially taken off of a portion of them. Does the testimony show that this representation was untrue ?.

Let us briefly examine the evidence upon this point. The witness, James M. Sprague, who has been at and near Two Rivers for the last twelve years, and engaged in the lumber business, says " that he was over a portion of the Norton tract, " consisting of 2,700 acres, within a year, and before Novem- " ber last; that on the portion he was over, the sawing timber " was pretty much cut off; he went through it; that the road " runs through the tract, and that he had been frequently " over it, and in other directions along the river; that he did " not examine it with reference to an examination; that it is a " great job to examine and go over 2,700 acres of pine lands, " and that the portion he was over was a small portion of the " tract; that he had been over it within the last year; has " been familiar with this tract for twelve years; hunted cattle " over it within the last three years; the portion he had been " over, so far as he had examined, had the sawing timber pretty " much cut off. As to the Starkweather tract, consisting of " from 1,600 to 1,800 acres, a portion of it that lies immediately " along the East River is cut off, and was so cut off last Novem- " ber, and on a portion of it the timber was very fine." Benjamin F. Sias, who has resided for most of the time for the last ten years at Two Rivers, and had almost weekly been over the lands owned by Aldrich, Smith & Co. during that period, says: " In my opinion about three-fourths of the pine timber origin- " ally on said lands had been cut off in November, 1855. The " best of the pine has been taken off. Most of that remaining " is rather of an ordinary quality. I should think about 25 or " 30,000,000 feet of common logging pine timber remaining. " I should judge there had been cut off between 75 and 90,000, " 000 feet of lumber; from four to six millions feet of lumber " was taken off last winter, as I should judge." James Phillips,

testifies : " I have known the land the Deacon's shanty is on;
" think they claim it as Pine lands, but there is not much pine
" on it now ; about 25 acres cleared."  Adolphus Morseau,
knew a part of the pine lands of the firm ; had been over sec-
tions 13 and 15, not included in the 4,000 acre tract, and pre-
sumed he had been over other sections many times ; says :
" What I have mentioned is timber lands; some parts have had
" timber taken off, and some have had no timber taken off ;
" can't give any idea of what proportion of timber has been
" taken off ; but presume a small part of the timber on the
" land I have referred to."   In reference to the 4,000 acre
tract, he says : " I do not know anything about the 4,000 acre
" tract ; suppose I have passed through it on the road from
" Two Rivers to Mishecott ; I do not know what part of the
" pine timber was taken off this land in the fall of 1855 ; some
" places now are cleared off entirely, and almost ready for a
" farm ; other places timbered up to the road ; should think
" two thirds of the timber gone off from that part of the land
" in sight from the road."   Benjamin Berdsall, a farmer and
lumberman residing at Mishecott, on town 21, was pretty well
acquainted with some of the lands of the firm in his vicinity,
says : " I should judge that one-half of the pine timber had
" been, in the fall of 1855, taken off the lands of the company
" in town 21 ; have never been over the 4,000 acre tract, unless
" the road passes through it ; pretty much all the pine timber
" on the 4,000 acre tract within the range of my vision, as I
" pass along the road from Mishecott to Two Rivers, was, in
" the fall of 1855, taken off ; what was not taken off was des-
" troyed by fire."   It appears from a schedule of the lands of
the firm, furnished by Hezekiah H. Smith, that the lands of
the firm in town 21 was some 23 or 2,400 acres.

John E. Berdsall testified : " I reside in the town of Mishe-
" cott ; my business is lumbering and farming ; have lived in
" this county six years ; know the firm of Aldrich, Smith &
" Co., as a firm ; have been over a part of their land in town
" 21 ; am some acquainted with sections 21, 27, 34 35, but not
" so familiarly with 27 as with the others.   Am acquainted

"with section one in town 20, and some with 13; have been "over it; am well acquainted with 14; I have bought and "sold lands some in that vicinity; those lands I should consider "in the fall of 1855, worth four dollars per acre; lands in that "vicinity were selling for four dollars per acre at that time. "There was some government land then for entry in that vici- "nity. I should think there were two-thirds of the pine tim- "ber taken off from the lands of the company in fall of 1855. "Have been over the lands claimed by Aldrich, Smith & Co., "denominated the 4,000 acre tract, that portion which I have "been over, knowing by hearsay to be the 4,000 acre tract, I "should think the timber had been pretty much all taken off "from it in the fall of 1855." We think it impossible to doubt, upon reading this testimony for the appellant, that the representations made at the time of the sale by the appellee, that most of these lands were covered with fine pine timber was grossly inaccurate, erroneous and false. Nor do we think that the evidence upon this point taken by the appellee essentially changes this view of this case.

Hezekiah H. Smith, a witness for the appellee, who was one of the partners of the firm of Aldrich, Smith & Co., and furnished schedule "A" which contained a description of 5,920 acres belonging to the firm; "thinks that, take the lands "together mentioned in schedule "A," more than half of the "pine had been cut previous to November, 1855." He further says: "Forty acres in section 12, town 20, range 24, is the "only piece that was nearly or entirely cut over up to the 28th "of November last; and that 40 was improved and stocked "down." And in answer to a question to state the condition of each tract severally, as to pine timber which was contained in the schedule, he states; "I can't do it, as it is impossible; "on all except that previously described as being the land on "which no timber had been cut." (which was some 10 or 1100 "acres) of any consequence by the firm; there has been timber "cut so as to injure the value of the land to some extent."

William B. Farnum, who was acquainted with the 4,000 acre tract, in reply to a question as to what proportion of tim-

ber had been taken off from the land on this tract through which the road runs, states: "Should think that as far as I " can see it, it is two-thirds taken off. A large majority of the "timber is down, but it lies on the ground very thick; think "three-fourths of the timber next to the road was taken off; " can't say whether I have been on the whole of the tract; " think I have been on every acre. There are acres of land " that there is no pine on ; can't say how many."

Daniel Smith states that " section 1, town 20, range 23, is " the best pine timber the company have ; a good deal of pine " had been taken off this before November, 1855, and yet a "great deal of timber is there."

The above is all of the evidence in the case bearing directly upon the point as to the quantity and quality and character of the pine upon the lands, except the testimony of William Aldrich, who must be, (if we were to judge of his character from his evidence in the case) a man of most sanguine temperament, and of rather extravagant views ; who has certainly given to all the affairs of the firm of Aldrich, Smith & Co. the *couleur de rose,* and whose testimony it would not be safe to place in competition with that of the numerous intelligent and reliable witnesses already named, even if his testimony should materially conflict with theirs, as it really does not, and we therefore do not think it necessary to dwell upon it. His testimony does not in the least shake the conclusion deduced from the whole evidence in the case, that these statements as to the pine upon the lands were not true, correct and faithful.

That the misrepresentation was in a matter of substance, important to the interests of the appellant, and which went to the very essence of the contract, probably will not be denied. Here was a proposed investment of the appellant in all of about forty thousand dollars, in a business and principal part of which was the manufacture of lumber. He had bought an interest in expensive saw-mills, and in several thousand acres of what had been represented as fine lands. Does any one suppose that it was a trifling, immaterial and unimportant thing

to him whether these lands had pine upon them or not? The whole case shows most clearly and irresistibly, that these lands had been secured by the firm for the purpose of furnishing logs for the mills; and that the appellant bought them for a like object, is too obvious for argument. But again it is insisted that if any representations were in fact made, the complainant was not at liberty to rely on them for the reason that he had within his reach reliable sources of information in regard to the property and business of Aldrich, Smith & Co. Now it is to be borne in mind that the appellant resided in the city of Milwaukee, at some distance from Manitowoc county, were these lands were situated. Although he had attempted in the fall before making the trade, to go and visit the lands, survey and examine them for himself, yet it appears he was prevented from accomplishing this object. It does appear that he visited Two Rivers some two months after the contracts were made. But at the time he entered into these contracts he had not seen those lands, and the appellee knew it. Under such circumstances the appellee made the representations he did in regard to the character of the timber upon these lands. Does it lie in his mouth to say now that the appellant had eyes and understanding, and should have traveled to Manitowoc county and examined those lands for himself? Or that he should have hunted up some dormant partners in Milwaukee or Chicago, of whom he should have made inquiries as to the timber on the lands? We do not think the appellant was called upon to exercise any extraordinary diligence in this case. See the case in 5 John. C. R., 174; 13 Peters, 26; and 5 Day, 439. And we will again adopt the language of the court in 13 Peters, and say, "that where, "from the remote situation of the land, or any other cause, a "contract is made for the sale of land without viewing it, "there is the same reason that the seller should be responsible "for a false affirmation respecting its quality as for any other "fraud. We think we may safely lay down this principle, "that wherever a sale is made of property not present, but at "a remote distance, which the seller knows the purchaser has

"never seen, but which he buys upon the representation of "the seller, relying on its truth, then the representation in "effect, amounts to a warranty; at least, that the seller is "bound to make good the representation." In this case the representation was of a fact which it seems incredible, almost, to believe the appellee did not know was untrue. But still if he was mistaken, inasmuch as this mistake was in a material point, and the appellant bought upon the faith of the representation, the appellee is not exempted from liability for such misrepresentations, and the contract should be rescined.

It is further insisted that some two months after the execution of the contracts, the appellant went to Two Rivers, saw the steam saw mills, the village property, and had the best possible opportunity to inform himself of the extent, character and value of the business and property of the firm, and that in fact he did make numerous and full inquiries of those who knew more of the property than the appellee even did, or could have known, and actually received information in regard to the extent of the business, the amount of the property, real and personal, and then afterwards entered into the agreement of the 17th of January, 1856, in reference to the personal property, and thereby ratified and confirmed all that had been done before. But it is to be observed that at this time the appellant did not examine the pine lands, and that the witness, Aldrich, of whom the appellant made inquiries as to the amount of pine on the land, told him "that we "could go on and do the business he had been doing, without "exhausting the pine for fifty years." There is nothing in the case to show that the appellant ratified and confirmed the contract, after he was actually informed of the true condition of the pine lands.

For these reasons we are of the opinion that the decree of the circuit court must be reversed and the cause remanded for further proceedings in conformity to this decision.