GEORGE M. STONEMETS and MARGARET STONEMETS v. A. N. HEAD, Appellant.

Division One, February 28, 1913.

1. PRACTICE: Demurrer: Untimely: After Answer Filed and Evidence Taken: Waiver. Where defendant entered appearance and filed a general denial, and a year later, after depositions had been taken and many witnesses had been subpoenaed, withdrew the answer, a demurrer then filed, charging that the petition does not state a cause of action, is not entitled to as favorable a consideration as if it had been timely filed. By that delay defendant did not waive the right to challenge the sufficiency of the petition, but because of the untimeliness of the demurrer the petition will be viewed with a benignant eye, and its allegations are entitled to every reasonable inference and intendment arising from very liberal construction.

2. PLEADING: Demurrer: Misrepresentations: Uncertain and Indefinite. A demurrer challenging the sufficiency of the petition does not fill the office of a motion to make more definite and certain. If the petition charges that defendant misrepresented the productiveness of the farm traded to plaintiff, the soil and conditions, their lack of knowledge, etc., a criticism that the allegations are too general, too indefinite, smacking of conclusions, etc., will not be considered in response to a demurrer charging the petition does not state a cause of action.

3. MISREPRESENTATIONS: Opinion. Where plaintiffs traded their Illinois farm for defendant's Missouri lands which they had never seen, a statement by defendant that the soil of his Missouri land was as good and productive as theirs, was a statement of fact, not of opinion, he knowing the productive qualities and soil of both and knowing plaintiffs did not. It amounted to, or was in the nature of, a sale by sample.

4. ———: Of Fact: Hard-Pan: Hazel Brush Land. Statements by defendant that there was no hard-pan on his land; that the post-oak land was as good as Illinois hazel-brush land; that the cultivated land was well drained; that there was a living well on it; that the cherry trees produced wagon loads of cherries. are all representations of facts, and not opinions.

5. ———: Religious and Moral Pretenses. The fact that defendant, on learning that plaintiffs were church people, interested in temperance work and Sunday schools, declared himself to be very much interested in the same way and warring in the same cause, and thereafter on being anxiously pressed on a statement of facts about the farm he was trying to trade them, stated he would not tell a lie for his farm or for the world, is not without significance in determining whether by false representation he tricked them out of their home.

6. ———: Husband and Wife: Principal and Agent. Where plaintiffs, husband and wife, traded their 120-acre Illinois farm, of which forty acres belonged to him and eighty to her, for defendant's land in Missouri, the case to cancel the deed and for damages for fraud must proceed on the theory that the husband in coming to Missouri to look at the land, against her protest, was not the agent of his wife.

7. ———: Investigation: Positions of Equality. Although the husband, on defendant's suggestion and against the wife's protest, came to Missouri to examine the land at a time when it was frozen, and was shown over the land by a former resident of Illinois to whom he had been referred by defendant and who is shown to have been friendly to defendant, who used him on former occasions to show the land to would-be purchasers, and all the husband saw was what a stranger could see in passing over the land once in the winter time when the ground was frozen, yet it will not be held that plaintiffs traded their Illinois farm, two-thirds of which belonged to the wife, for the Missouri land, after an investigation of their own and in reliance upon their own judgment, but did trade in reliance upon the misrepresentations of defendant, if the evidence shows that the land was "crawfish land," a "flat grey land," of "blue joint clay" or "yellow clay," consisting of a thin soil "underlaid with hard-pan," and if the evidence also shows that after the husband's return the wife was opposed to the trade and said to defendant that she had no confidence in her husband's judgment based on a casual and short visit in the winter to land in a strange country, and thereupon defendant represented to them that the soil was deep and rich, that there was no hard-pan, and backed up his representations by unctious religious professions, and on the

strength of these representations the trade was made—the defendant knowing the facts, and plaintiffs not being in a position of perfect equality with him.

8. ————: ————: **When Relief Is Granted.** Parties, who, without knowledge of their own, or without ready means of knowledge, buy in reliance upon the misrepresentations of material facts, known to be false by the party making them and intentionally made to deceive, or made recklessly without knowledge of their truth or falsity, and who have thereby been deceived and defrauded to their injury, are granted relief.

9. ————: **Fraud: Specific Rules and Definitions.** The law of fraud must arise on the facts of each case. Fraud is infinite, and courts do not cramp themselves with hard-and-fast definition. Courts match their astuteness against the versatile intention of fraud-doers, and accordingly definitions of fraud are of set purpose left general and flexible.

10. ————: **Of Value: Matters of Opinion.** Where parties do not stand on an equal footing of opportunity and knowledge, a positive assertion by a vendor of the value of the thing held in treaty, when false and fraudulent, may be actionable, if the statement was a material inducement of the trade or sale, although stated in another form and under different circumstances it might have been a mere 'opinion. So a statement by defendant that his Missouri land was worth $60 per acre, false and known by him to be false, and made to plaintiffs, at their Illinois home, who did not know it was false, and could not know without expense and inconvenience, and made by defendant to induce a trade of their respective farms, and relied upon by plaintiffs as true, was properly considered by the chancellor in reaching a decree that the false representations of defendant brought about the trade.

Appeal from Audrain Circuit Court.—*Hon. James D. Barnett,* Judge.

AFFIRMED.

*Fry & Rodgers* for appellant.

(1) The petition does not state facts sufficient to constitute a cause of action. It pleads matters which are manifestly mere opinions and which a reasonably prudent person would not rely on. Smith v. Sims, 77 Mo. 274; Johns v. Railroad, 79 Mo. 92; Redpath v. Lawrence, 42 Mo. App. 109; Reed v. Batt, 100 Mo. 66.

The petition pleads a number of conclusions which must be disregarded in passing upon its sufficiency. "A demurrer admits only facts pertinently pleaded, it does not admit conclusions." Hand v. St. Louis, 158 Mo. 213; State v. Aloe. 152 Mo. 467. In paragraph five the petition pleads no facts, but mere conclusions. These are not sufficient to state or aid the statement of a cause of action. Seving v. Furniture Co., 150 Mo. App. 581. (2) This was an equity case. Much of the testimony was read from depositions. Under the pleadings and whole evidence the verdict should have been for the defendant, and it is for this court to review the evidence and render such judgment as the trial court should have rendered. Wilson v. Jackson, 167 Mo. 135; Cornwall v. McFarlane, 150 Mo. 377; Anderson v. McPike, 86 Mo. 293; Nauman v. Oberle, 90 Mo. 666; Brown v. South Joplin, 194 Mo. 681; Harrison v. Walden, 89 Mo. App. 164; Wade v. Ringo, 122 Mo. 322; Davis v. Ins. Co., 81 Mo. App. 264; Dunn v. White, 63 Mo. 181; Lewis v. Land Co., 124 Mo. 686. (3) In no event and under no possible view of the testimony should there have been any relief granted to George M. Stonemets. See cases under point 2.

*H. P. Warden, F. R. Jesse, S. D. Stocks* and *Barclay, Fauntleroy, Cullen & Orthwein* for respondents.

(1) After verdict, and especially in equity cases, the petition will be liberally construed in favor of the pleader. Wycoff v. Hotel Co., 146 Mo. App. 554; McIntyre v. Ins. Co., 142 Mo. App. 256. The petition is sufficient under all the authorities. Adams v. Barber, 157 Mo. App. 370; Nauman v. Oberle, 90 Mo. 666; Hoffman v. Gill, 102 Mo. App. 320; Carr v. Sanger, 122 N. Y. Supp. 593. (2) While the demurrer was filed in this case, it was not filed before the second day before the trial, and the court was warranted in overruling it, because it was not filed within a reasonable time in advance of the trial. (3) On an exchange of

property one party may rely on the representations of the other as to the value of land remotely situated in another State, or where the party making the representation is possessed of special knowledge regarding the subject-matter of which he speaks. Crandall v. Parks, 93 Pac. (Cal.) 1018; Scott v. Burnight, 107 N. W. (Iowa) 422; Brownlee v. Hewitt, 1 Mo. App. 360; McBeth v. Craddock, 28 Mo. App. 380; Stones v. Richmond, 21 Mo. App. 17; Cahn v. Reid, 18 Mo. App. 115; Loaiza v. Court, 85 Cal. 11; Morgan v. Dinges, 23 Neb. 271; Miner v. Medbury, 6 Wis. 295; McKnight v. Thompson, 39 Neb. 752; Morders v. Kattleman, 142 Ill. 96. (4) If a vendor has superior knowledge of the property sold, and knowingly gives a false opinion in regard to a material fact with the intention of defrauding the purchaser, an action may be maintained against him for fraud. Collins v. Jackson, 54 Mich. 186; Stebbins v. Eddy, 4 Mason, 417; Thompson v. Ins. Co., 75 Me. 55; Gordon v. Butler, 105 U. S. 553; Pike v. Fay, 101 Mass. 134. (5) If the seller of land knowingly represents the property to be worth much more than it is, and also knows that the vendee knows nothing of the value, his representations of value are fraudulent. Cressler v. Rees, 27 Neb. 515; White v. Sutherland, 64 Ill. 181; Smith v. Countryman, 30 N. Y. 655; Wright v. Wright, 37 Mich. 55. (6) If a vendor combines with a third person so that they conspire to mislead the purchaser as to the value of the property sold, it will be such fraud as will render them liable to an action. Kenner v. Harding, 85 Ill. 264. (7) If the person making the representations believed or had good reason to believe that they were false, or if he assumed or intended to convey the impression that he had actual knowledge of their truth though conscious that he had no such knowledge, the *scienter* necessary to maintain an action for deceit founded on fraudulent representations is established. Dulaney v. Rogers, 64 Mo. 201; Caldwell v. Henry, 76 Mo. 254;

Walsh v. Morse, 80 Mo. 568; Nauman v. Oberle, 90 Mo. 666; Bank v. Sells, 3 Mo. App. 85; Koontz v. Kaufman, 31 Mo. App. 397; Rowell v. Chase, 61 N. H. 135; Railroad v. Tyng, 62 N. Y. 563; Sharp v. New York, 40 Barb. 257; Meyer v. Amidon, 23 Hun, 553; Loper v. Robinson, 54 Tex. 511; Hamlin v. Abell, 120 Mo. 188; Bacon v. Frisbie, 15 Hun, 26; Jackson v. Collins, 39 Mich. 557.

LAMM, J.—Plaintiffs, husband and wife, with a family of six children, resided on a farm of 120 acres in Fulton County, Illinois. Eighty acres of it belonged to Margaret and forty stood in the names of Margaret and George jointly as baron and femme. This little farm, with a modest outfit of farm implements, stock and household goods, was their all. In that regard Nathan's one ewe-lamb allegory is apposite. Their farm will be called the Illinois farm. They seem to belong to a class that should be well beloved (because, as a great soul once suggested, God had made so many of them), viz., straightforward, simple-minded, hard-working, trustful and confiding people, members of the church and alive to ethical work, including temperance. (The moral of which lies further on. Of which more presently, anent Head himself.) Their farm, improved and productive, was well worth $60 per acre cash. It was encumbered for $2800 and George got it into his head that a larger farm could be profitably worked while he had his large family in hand, thereby making hay while the sun shone. Old Polybius says, sourly, "Man is the most gullible of all animals." Be that so or not so, it seems these plaintiffs were little versed in the guileful ways of traders.

Thirty miles away in the same county, and a stranger to them, was a man who (on this record) seemingly lived by his wits, a trader and real estate agent named Head, who had got on in the world as such. Among others, he owned a farm of 236 acres

in Audrain county, Missouri, subject to an encumberance of $4500, and twenty acres adjacent unencumbered. These two tracts will be called the Missouri farm for convenience. He had traded for all of this land, except the unencumbered twenty, some years before, was no stranger to it and knew it as a worn out, nonproductive farm (inclusive of the twenty) with a bad reputation, a "trading" property long in the hands of renters. There was evidence there was no other farm like it in the neighborhood. It stood alone in bad preeminence. Which fact we emblazon and embalm to the credit of Audrain county. He had tried to rid himself of it without success till he met up with plaintiffs. A while before his trade with them he had listed it in a land agency at $35 per acre, agreeing to pay a commission on that price. He had tried the unusual plan of trying to dispose of it at public auction by a covinous device, to-wit, the enticing and stimulating aid of by-bidders and puffers. At that auction at the county seat of Audrain county, Mexico, he screwed the price up (by by-bidding alone) to $35 an acre, but got no real bidder above that (or at that) and it was struck off to one of his by-bidders on his simulative bid and no deed was made. The entire Missouri farm was worth, say, $20, or at best $25 per acre in cash—and we think Head knew that fact. In other words, barring the twenty-acre tract, which agreed in worth with the general run of the farm, it was encumbered for about its worth.

In January, 1908, Head traded his Missouri farm to plaintiffs for their Illinois farm, putting the title in plaintiffs jointly, each party to the trade assuming the other's original encumbrance. Plaintiffs, as said, put in their land at its true cash value, to-wit, $60 per acre (which Head knew) and Head put his in at the claimed (but simulated) value of $60 per acre (which Head knew they did not know) and took a note and deed of trust by way of boot for $6288, evidenced by a

note due in seven years and secured on that part of the Missouri farm already under mortgage.

Shortly, plaintiffs broke up their home in Illinois, moved to Missouri and took possession of their new purchase. Shortly, Head sold the Illinois farm for $65 per acre.

(*Note*: There is some evidence from which it might be inferred that Head was fleeced when he traded for the Missouri farm several years before, but it is not contended by counsel that such fact, if fact it be, justified him in turning about and in turn fleecing plaintiffs. Such application of the doctrine of the Squib case whereby one passes a bad trade on to another, an innocent party, as the boy in the Squib case tossed on the burning squib [Scott, an infant, v. Shepherd, an infant, 2 Blackstone's Rep. 892] would be novel indeed. That A, bitten by B, may by that token in turn bite C, in a like way by the same device, is a doctrine unknown to this court.)

In the late summer of 1908, plaintiffs sued in equity to cancel said deed of trust and note and for damages. This on the thory that the trade was made on the strength of false representations by Head as inducements thereto and relied upon by them; that they had been the victims of an arrant swindle whereby they were tricked out of their farm and were entitled to relief in equity to that extent.

From a decree cancelling the note and deed of trust and awarding them $2400 in money damages, Head appeals, raising two general questions for decision, viz: (1) Does the petition state facts sufficient to constitute a cause of action? (2) Does the evidence support the decree?

Other facts will appear in connection with the discussion of those questions.

I. *Of the petition.*

(a) Preliminary to the main contention on the

petition a foreword is due. Brought in the circuit court of Audrain in July, 1908, the bill contemplated that the suit would proceed on constructive service. However, afterwards, defendant appeared personally and answered by a plain general denial. Thereat, with the pleadings in that fix, many depositions taken in different states were filed for use; and, preparatory to the final hearing, as we gather, witnesses were summoned to be in attendance at the trial term (June, 1909). Two days before the trial was set, and apparently after all preparations therefor had been made, defendant withdrew his answer and filed a demurrer on the general ground that the petition did not state facts sufficient to constitute a cause of action. On the next day the demurrer was overruled, defendant excepted and refiled the same answer. On the next, the trial progressed.

*Untimely Demurrer.*

On such record the demurrer is not entitled to as favorable consideration as if it had been timely filed and the sufficiency of the petition had been challenged *in limine.*

That there were some considerations in the nature of equities springing from so belated a challenge to the petition, to be reckoned with in the practical administration of justice, is apparent, and courts are fond of remarking on them. When the answer was filed and remained on file for nearly a year it was equivalent to a notice that defendant challenged the facts, not the sufficiency of the petition to state a cause of action. That is, it was tantamount to a formal standing notice that defendant considered the petition good, that he raised no issue of law on its allegations, but put the facts in issue and evoked the law applicable to those facts when established at the trial. On that theory testimony was taken, delay occurred, witnesses were summoned and expense incurred, all preparatory to a trial on the merits.

As to such lying in wait, the doctrine of this court. is not that defendant waives, once for all and out and out, the right to challenge the sufficiency of the petition; but, while that is so, it is settled, as said, that so untimely a challenge is not entitled to the same consideration as if timely; and, further, that a petition so challenged will be viewed with a more benignant eye than one demurred to at the outset. The allegations of such petition severally are entitled, in such emergency, to every reasonable inference and intendment arising from very liberal construction. Mere lack of precision or certainty in averment will not be taken as a capital vice, nor will mere informality of statement of an essential fact be fatal, nor will it do to say that a cause of action is defectively stated. There is an apposite discussion in a very late case (East St. Louis Ice & Cold Storage Co. v. Kuhlmann, 238 Mo. l. c. 702, *et seq.*), where the authorities are marshaled and the above rules for disposing of such question are laid down.

Related logically to the observations just made are others, viz.: A litigant, by motion to make more specific, definite and certain those allegations enumerated in his motion which are indefinite, uncertain, obscure, equivocal or otherwise lacking in precision, may have relief. He is entitled to have the issues sharply defined and thereby know to a moral certainty the scope and character of the charges made against him. This, in order to meet them. Such motion is a useful expedient of every day use, *nisi,* to coerce good pleading, that is, "good matter pleaded in good form, in apt time and due order." [Coke Litt. 303a.]

Now, this defendant filed no such motion and may not under the guise of a general demurrer complain of the petition in such particulars. It may be granted, *arguendo,* that the petition, somewhat loosely and inartificially drawn, was subject to such motion on some of its averments, but, absent such motion, the proof

took a wide range on both sides, apparently on the theory that both parties construed the averments sufficient to cover such proof, barring the one question of the admissibility of testimony on representations on the value of the Missouri farm. That kind of testimony was objected to. The testimony on other alleged misrepresentations seems to have gone in without objection. No one has been injured or misled by generality of averment. Both parties having put the same construction on the meaning of the petition and introduced their testimony accordingly, this court ought not to cut up by the roots a meritorious case, when the end is reached on appeal, because of a criticism of the petition as lacking in certainty and definiteness. Agreeably to that view of it are cases from the Supreme Court of the United States and this court collated in Bragg v. Railroad, 192 Mo. l. c. 358 (*q. v.*).

(b) Recurring to the main question (to-wit, does the petition state facts sufficient to constitute a cause of action?) we will not swell this opinion by reproducing the petition. It divides itself naturally into two parts. In one, complaint is made of alleged misrepresentations of value. In the other, complaint is made of alleged misrepresentations of matters of fact relating to a comparison of the Missouri farm with the Illinois farm; misrepresentations on productiveness, rental value, soil, conditions, etc.

(1) As to value, it is argued with confidence that there is no such thing known to the law as an *actionable,* false representation of value. Misrepresentation as to Value. We purpose dealing with that question when we come to the merits. We dismiss it on the question of pleading with this observation: Defendant does not contend the pleading is defective in *form* in stating the misrepresentations of value. His contention, going deeper, is tantamount to this, to-wit, that the form of the allegations is well enough, but that they are without substance—i. e., con-

ceding them true, they amount to nothing in equity. To that view of it, as said, we will recur under another head.

(2) As to the ·pleaded misrepresentations in other particulars, we construe the criticisms to be that

Uncertain
Allegations:
Demurrer.

they are too general, too indefinite, smacking of conclusion, etc. Broadly, in effect, they amount to a contention that a motion to make more specific and certain would have been sustained, if made. We have already ruled in paragraph *a* that this demurrer fills no such office. The petition avers the making of the false representations by defendant (setting them forth as heretofore indicated); the nonresidence and lack of knowledge of plaintiffs; their reliance upon the false representations in making the trade; their injury by them and no question is raised that the *scienter* is not sufficiently laid.

Defendant is entitled to the rule that while his demurrer admits the truth of averments of substantive fact, it does not admit facts not well pleaded, or impossible or absurd averments, or the soundness of mere conclusions of law, or the mere conclusions of the pleader upon the facts constitutive of his cause of action, or mere argumentative matter. Giving defendant the benefit of that rule, yet we conclude (the premises all considered) that the ruling on the demurrer was well enough; and this whether we consider it here technically as a ruling on the demurrer itself or a ruling on the sufficiency of the petition to state a cause of action, a point open, without a demurrer at all, to be heard on appeal. [Hudson v. Cahoon, 193 Mo. 547.]

II. *Of the merits.*

In classifying facts some of the judicial characterizations, distinguishing one from another, have been as "a presiding fact," "a master fact," "broad day-

light facts," "a fact that overlaps all other facts," "a
test fact." [1 Moore on Facts, p. 11.]  Now, the mas-
ter, the broad daylight fact in this case is that plain-
tiffs were tricked out of their farm.  Even he who
runs may read that overlapping fact writ large in the
record.  It was lost to them as effectually as if an
earthquake had swallowed it.  So, what they lost Head
got, the proverb running: It's an ill wind blows no-
body good.  The chancellor must have found they
were stripped naked by lies they believed true.  That
the thing was done cannot be gainsaid; and the ques-
tion resolves itself into another, viz.: Can equity give
relief?  Attending to that, there was evidence from
which the chancellor could believe, and doubtless did
believe, that Head told them at their Illinois home, in
effect, pointing to their land with a flourish of his
hand, that the soil of his farm in Missouri was as good
and as productive as theirs.  What is ᐧfact and what is
mere opinion is often a close question.  The one easily
shades off into the other or is handmaiden
to the other, but we make no question but
the foregoing was a statement of fact.  It
amounts to, or is in the nature of, a *sale by
sample*.  The fact is that he knew of the productive
qualities of both farms, knew plaintiffs did not and
knew that representation to be a bald falsehood.  The
Illinois land to his knowledge would produce thirty
bushels of wheat to the acre.  The Missouri land would
produce none.  Its soil had been depleted beyond
wheat-bearing.  The soil on the Illinois land was deep
and rich, producing fine corn, grains and tame grasses.
Not so the Missouri farm.  There was no hard-pan on
the Illinois farm, and, on being inquired of, Head
told plaintiffs there was no hard-pan on the
Missouri farm.  No one who ever ran a
furrow would take a representation of the
absence of hard-pan as a mere conjecture or opinion.
If facts are stubborn things, hard-pan caps the cli-

Misrepre-
sentation:
Opinion.

————: of
Facts.

max and fills the bill. The truth was that under this
evidence, to Head's knowledge, his Missouri farm had
a thin soil underlaid with hard-pan; it was a washed,
neglected, rundown and worn out farm that had been
in culitvation for fifty-six years with no effort to build
it up. Its soil was characterized by those who knew
it well as "crawfish land," a "flat grey land," of "blue
joint clay" or "yellow clay," a "dead looking soil,"
producing, say, ten or twelve bushels of corn per acre
and of a rental value of, say, one dollar per acre, if
so much. The rental value of the Illinois land was
from $3.50 to $5 per acre. The Missouri farm was
part prairie and part brush and timber. The brush
land was of a poor quality—post oak sprouts, etc.
The latter was represented by Head to be as good when
cleared as the hazel brush land on the Illinois farm.
That representation of fact was false. He repre-
sented the cultivating land as well drained; to the
contrary, it had been farmed so indifferently that
water stood upon it and it is designated as "water
killed." Stress being laid on a living well by plain-
tiffs, Head assured them there was such a well on his
place, when in truth there was no such well. He
grossly misrepresented the fruits on the farm—among
other ways by saying that the cherry trees there pro-
duced "wagon loads of cherries"—a great falsehood.
In short, if plaintiffs' testimony is to be taken as true,
Head, in a long conversation descriptive of the farm,
told them no truth whatever. There is another mat-
ter of significance, a most humiliating one, viz.:

**Hypocrisy.** Shortly after his appearance at Stonemets'
home in Illinois, it fell out that Head dis-
covered plaintiffs were church people, interested in
Sunday schools and temperance work. Observe what
followed. Was Head interested in that line? Pre-
cisely, and very much so. In the great controversy
of Good v. Evil (old, yet ever new) he was enlisted
on the side of temperance, Sunday schools and

churches. They had a good "friendly chat about that." They were warring in the same cause. We fear, we very much fear, that in all this Mr. Head

"Stole the livery of the court of Heaven to serve the devil in,"

to use the strong words of a gloomy writer, thereby weaving a net for his neighbor's feet. Presently dinner was announced and Head, having prior to that by the tone and thread of his discourse admitted his qualifications for that pious office, was invited to say grace. Looking fore and aft at the whole transaction we have reason to remark that no doubt he said it as unctiously as the middle member of the firm of Quirk, Gammon and Snap would have done under like circumstances. For what is the rule of construction on hypocrisy, except, By their fruits ye shall know them? Having eaten salt at their table (which creates an obligation even the Arabs of the desert are said to respect) he assured them, on being anxiously pressed on his statements of fact about the farm, that he "would not tell a lie for his farm" or "for the world." Oh, Deceit! (we speak in judicial sadness) thy name is Head. It is under such circumstances, and after worming his way into the esteem and sowing seeds of confidence in the bosoms of these unsuspecting people, that this trade was made on Head's representations. There is no call to mince words and speak daintily. The case calls for plain speaking and I pause long enough to say this in passing: It is said that one of the names of the Evil One is that of the Father of Lies. In sacred annals there is preserved an incident of an evil spirit, possibly said Father of Lies (but for this latter I do not vouch) entering into a herd of swine, whereat the hogs destroyed themselves by rushing violently down a steep place. So, Head, because of an evil spirit that possessed him and caused mis-

chief, was decreed by the learned chancellor a fate somewhat similar.

It will be of judicial interest to know upon what ground his learned counsel seek to reverse that decree. It runs this way: In the first place, as to the representations on value, Head seeks to escape through the loophole that such representations (if made), although false, are not actionable. (Of which more presently.)

In the next place, other representations are of no avail or substance, it is argued, because mere opinions, or, if not that, then mere commendations. In other words, they fall (as we construe the argument) within what the books designate as "dealers' talk," "trade talk," "puffing," "vague laudatory flourishes," and come within the maxim, *Simplex commendatio non obligat;* or the doctrine of *caveat emptor.*

In the next place it is argued that plaintiffs did not put reliance on Head's representations but investigated for themselves and traded on their own judgments.

We have read this record line upon line and find no soundness in any of those contentions. This, because:

(a) *As to non-reliance and the so-called independent investigations of plaintiffs.*

The position of Mr. Head is that plaintiffs made an independent investigation and relied on that, or that they had no right to rely on his statements. That they made up their own minds in their own way. This contention seeks more of the facts, viz.:

Independent Investigation.

It seems that at a certain time George Stonemets met up with Head and was introduced to him as a real estate agent. The topic of Stonemets's desire to change his location came up and Head at once suggested a trade. Mrs. Stonemets was not present, the conversation happening in town and casually. We do

Head the justice of saying that he suggested Stonemets go and look at the farm. It may be at this incipient stage that Head would have liked to put the responsibility, if a trade was to be made, upon George Stonemets. Absent any testimony *pro* or *con,* it must be assumed that Mr. Head knew nothing about the title of the Stonemets land and would naturally think it rested in George, which it did not. At any rate, over the protest of Mrs. Stonemets, who doubted the ability of her husband to judge of strange land in another State in the winter time, Stonemets presently took the train and went to Audrain county. The case must proceed on the theory that Stonemets was not the agent of his wife in this trip or at all in the trade. She acted for herself.

Going back a little, in the original talk Head disclosed that adjoining the Missouri farm was that of a former Illinois farmer named "Wes" Duvall. Now, unfortunately for him, Stonemets had known Duvall slightly a generation before as a resident of his county in Illinois. When this fact appeared, Head suggested that he go and look at the farm and referred him to Duvall. There is testimony that Mr. Head said he would stand by, or "guarantee," anything Duvall said. As to Duvall, it is shown that he and Head were friendly. He had lived one winter with Head on the Missouri farm, was under some obligations to him and Head used him in one or more occasions in showing his farm to would-be purchasers. Duvall and Head deny corresponding about the proposed visit of Stonemets, but as they corresponded about some other purchasers, who proposed to visit the farm, it may be the chancellor took that denial *cum grano salis,* especially would he be presumed to know his man, since it is unlikely that Head would refer Stonemets to a man with an itch to throw cold water on a sale.

Taking up again the thread of the story, on going to Mexico, Stonemets inquired for Duvall and, learn-

ing the location of his place, arrived there about noon of a day in January when the ground was frozen. Duvall with others was busy setting telephone poles. Stonemets did not recognize him, but had him pointed out, and presently, after the poles were set, he made his business known and Duvall took him over the farm. He saw what a stranger could see on passing over the land once with the ground frozen in the winter time. Singularly enough, Duvall testified that he warned Stonemets of the poor quality of the soil; told him he would be disappointed and he put a value upon the land $20 or so below what Stonemets finally paid. But Stonemets tells another story about Duvall's statements, the details of which we omit, and gave him its value at $50 per acre. The chancellor might well believe Stonemets's version of his interview with Duvall; for there are internal indications of the improbability of Duvall's narration. It might well be the chancellor was of opinion he overdid his part in the role of frankness and honesty and that a decree ought not to be founded upon it. Staying all night at Duvall's house, Stonemets returned the next day to Illinois and notified Head to come to see him at his own home. Head came and the conversation occurred wherein Head made the representations we have heretofore set forth.

There was testimony that Mrs. Stonemets was opposed to the trade and stated she had no confidence in her husband's judgment, based, as it was, on a casual and short visit in the winter time to a new country and the slight information he had obtained by inadequate observation and inquiry.

In this connection, there was an incident of some significance, of this sort: A Mr. Smith who was judge of the county court of Audrain county, and a man of excellent judgment and repute, resided close to this land and Mr. Stonemets in his trip met up with him in inquiring for Duvall. He asked him about the

.Head farm and Mr. Smith's reply was very unsatis-
factory. It was that "if a man had some chickens and
some cows and had the farm paid for he might make
a living on it." This remark preyed on Stonemets's
mind, he told his wife about it, and when Head came
to see him he and Mrs. Stonemets told him what Smith
had said. Thereupon Head, evidently scenting dan-
ger to his trade, unless an antidote to Smith's poison
was administered, told them another cunning false-
hood tending to throw dust in their eyes and prevent
further inquiry, to-wit, that Smith had tried to get
the land, was unfriendly to him and interested in de-
crying it, etc. By such reprehensible means were they
deceived into disregarding Smith's warning. At a
stage in the general talk Stonemets told his wife in
Head's presence that the trade was now "up" to her.
We construe that to mean that George stepped down
and out and left the matter with her to settle. There-
upon she pursued her inquiries of Head and he con-
tinued his representations and assurances as set forth.
There was direct testimony that plaintiffs relied on
his representations then made and that they were the
inducing cause of the woman and her husband finally
agreeing to part with their farm. The chancellor so
found and we see no reason to doubt the soundness of
his judgment. The substantial title being in Mrs.
Stonemets, it was necessary to persuade her and Mr.
Head undertook to do that and succeeded. We lay out
of the case the mere glowing picture by way of argu-
ment and advice which Mr. Head painted to help ac-
complish his purpose, relating to future prospects,
possibilities, and what might be done on the Missouri
farm, all sounding in prophecy and conjecture and
hid away in the womb of the future. We confine our-
selves to the representations of present fact made by
Head. That the lady relied on his statements is as
clear as the noonday sun and we think her husband
did also and that both had the right to do so. They

were not in a position of perfect equality with Head. As said, he knew all, and they, as to the facts within the representations complained of, knew only what he told them. He knew they did not know and, what is more, knew they relied on him as a Christian gentleman who posed in the George Washington role of telling no lies—especially about cherry trees. [*Vide*, Weems' Life of Wash.]

At root the object of all trading is *gain*. If no gain was allowed there would be no incentive to exchange of properties and little buying or selling. But .when so much has been said, and it is further said that the doctrine of "let the buyer beware" must be reckoned with and that simple general commendation is allowable as puffing and dealers' talk, yet there is a boundary that may not be crossed. The vehemence of the master passion, gain, must be cooled and curbed by the law; for not only is "the love of money the root ʋf all evil" (1 Tim. VI:10), but another wise man, who summed up ultimate truths in grave and short sentences, saith thus· "Aᴄ the nail sticketh fast between the joinings of the stones, so doth sin stick close between buying and selling." [Ecclessiasticus XXVII: 2.] The law abhors fraud—a thing that generally has its root in falsehood. the *suggestio falsi*.

The right general doctrine is that where parties, without knowledge of their own, or without ready means of knowledge (as for example, when they reside a distance away) buying on reliance on misrepresentations of material facts, known to be false by the party making them and intentionally made to deceive, as here (or made recklessly without knowledge of their truth or falsity) and who have been thereby deceived and defrauded to their injury, are granted relief. Agreeable thereto are all the authorities. We cite a sample of the cases and pass on. [Kendrick v. Ryus, 225 Mo. 150; Judd v. Walker, 215 Mo. 312; Adams v. Barber, 157 Mo. App. 370; McBeth v. Craddock, 28

Mo. App. 380.] The law of each case of this kind must arise on the facts of the case. *Ex facto jus oritur.*

The facts bring the case within the foregoing doctrine and our conclusion is that, aside from representations of value, plaintiffs made a case of fraud, deceit and consequent damages warranting the relief granted.

(b) *Of representations of value.* The case may proceed on the theory that Head represented his farm to be actually worth $60 per acre, and that plaintiffs relied, also, on that false representation as a causal factor in the trade. In that view of it, need the case rest alone on representations of fact aside from value?

The state of adjudicated cases in this State and elsewhere is such that the question whether fraudulent representations on value can ever be actionable, is not without some difficulty. To that question we pass.

Fraud is kaleidoscopic, infinite. Fraud being infinite and taking on protean form at will, were courts to cramp themselves by defining it with a

Misrepresentations: as to Value.

hard-and-fast definition, their jurisdiction would be cunningly circumvented at once by new schemes beyond the definition. Messieurs, the fraud-feasors, would like nothing half so well as for courts to say they would go thus far and no further in its pursuit. [Lord Chancellor HARDWICKE, in Lawley v. Hooper, 3 Atk. 278; Clyce v. Anderson, 49 Mo. l. c. 40; Howard v. Scott. 225 Mo. l. c. 712.] Accordingly definitions of fraud are of set purpose left general and flexible and thereto courts match their astuteness against the versatile inventions of fraud-doers.

Now, there is a general doctrine of the law that ordinarily statement of opinion is not the statement of a fact; and, since a false representation to be actionable must be that of a fact, a mere opinion (as for

instance, an estimate of *value*) cannot ordinarily form the basis of a false representation. But mindful of Lord Chancellor HARDWICKE's precept that fraud should be left undefined (thus permitting it to be adjudicated on the peculiar circumstances of each case), we would not expect that the general doctrine that an actionable fraud cannot sound in opinion, should be accepted as a hard-and-fast exclusion of all opinions in every case possible to put; for if that rule were once settled, as without any exception, the most heinous frauds would come to be perpetrated (under cover of so-called opinions) upon the trustful and the ignorant and go unwhipped of justice.

Pomeroy cautiously states acceptable doctrine on this head. Speaking of misrepresentations of matters of opinion, he says [2 Pom. Eq. Juris. (3 Ed.), sec. 878]:

"Since the very corner-stone of the doctrine is that the statement must be an affirmation of a fact, it has sometimes been said, but very incorrectly, that a misrepresentation cannot be made of a matter of opinion. The true rule is, that a fraudulent misrepresentation cannot itself be the *mere expression of an opinion* held by the party making it. The reason is very simple; while the person addressed has a right to rely on any assertion of a fact, he has no right to rely upon the mere expression of an opinion held by the party addressing him, in whatever language such expression be made; he is assumed to be equally able to form his own opinion, and to come to a correct judgment in respect to the matter, as the party with whom he is dealing, and cannot justly claim, therefore, to have been misled by the opinion, however erroneous it may have been. For this reason, the general praise of his own wares by a seller, commonly called 'puffing,' for the purpose of enhancing them in the buyer's estimation, has always been allowed, provided it is kept within reasonable limits; that is, provided the

praise is general, and the language is not the positive
affirmation of a *specific* fact affecting the quality, so
as to be an express warranty, and is not the inten-
tional assertion of a *specific* and material fact, known
to the party to be false, so as to be a fraudulent mis-
representation. The foregoing rule as to expressions
of opinions cannot be pushed beyond the plain reasons
upon which it rests. Wherever the statement, al-
though relating to matter of opinion, is the affirmation
*of a fact,* it may be a fraudulent representation. Such
an affirmation might be made in several forms. The
very fact concerning which the statement is made may
be the existence of an opinion. The existence of an
opinion may be a fact material to the proposed trans-
action, and a statement that such an opinion exists
becomes an affirmation of a material fact, and if un-
true, it is a misrepresentation. The opinion might
either be represented as held by a third person or as
held by the very party making the statement. As a
single illustration, either the third person or the party
himself might be an expert, and their opinion might
be material, so that the representation that the opin-
ion was held might be the affirmation of a most ma-
terial fact. There is still another and perhaps more
common form of such misrepresentation. Wherever
a party states a matter, which might otherwise be only
an opinion, and does not state it *as the mere expres-
sion of his own opinion,* but affirms it *as an existing
fact* material to the transaction, so that the other
party may reasonably treat it as a fact, and rely and
act upon it as such, then the statement clearly becomes
an affirmation of fact within the meaning of the gen-
eral rule, and may be a fraudulent misrepresentation.
The statements which most frequently come within this
branch of the rule are those concerning value.''

In a learned note to that section, copying copi-
ously from an English case (Haygarth v. Wearing,
L. R. 12 Eq. 319) that author continues:

"It cannot be denied that there is apparently a direct conflict of decision upon the effect of representations concerning value. The distinctions drawn in the text seem to me to be in perfect accordance with principle, and to be just and practical, and they will tend to remove most of the conflict, which is apparent rather than real. Statements of value are sometimes nothing more than the expression of the party's own opinion, and there is a group of decisions in which they are so treated. On the other hand, statements of value may be affirmations of a specific material fact, and there is a group of decisions in which they are so treated, and held to be fraudulent misrepresentations. There is no necessary conflict between these two groups of decisions, although the language of the judicial opinions has not always recognized and preserved the distinction between the two forms."

The text quoted is a just summary of the doctrines of many cases cited and quoted from in the note.

In Stebbins v. Eddy, decided by Judge STORY (4 Mason, l. c. 423), is an observation in point:

"It has been suggested at the bar, that fraud cannot be predicated of belief, but only of facts. But this distinction is quite too subtle and refined. The affirmation of belief is an affirmation of a fact, that is, of the fact of belief; and if it is fraudulently made to mislead or cheat another, to abuse his confidence, or to blind his judgment, it is in law and morals just as reprehensible, as if any other fact were affirmed for the like purpose. The law looks, not to the nature of the fact averred, but to the object and design of the affirmation."

In speaking of facts difficult of ascertainment by the purchaser it is stated in 20 Cyc. 58 that:

" . . . it is generally held that where the property involved is situated at a distant place and thus an inspection cannot be made without expense and

inconvenience, and the prospective purchaser is ignorant of the facts, he may rely on the vendor's positive statements regarding the property and may hold him liable if they are false and fraudulent, even though they are representations of the value, quality, and condition of the property; and the fact that the vendor himself has never seen the property and so informs the purchaser is not a conclusive answer to the action.''

In Smith on the Law of Fraud, sec. 68, the doctrine is put in this way:

''Statements as to value of property are, with but few exceptions, to be classed as mere opinions upon which reliance must not be placed and are not actionable. Where two persons are in treaty about the sale of any article of property—a painting for example—and both have equal means of knowing its value and its merits as a work of art, where neither is an artist or connoisseur and both are ignorant of its history, and the painting is present and open to the inspection of both, a mistaken opinion as to the value or character of the property would not invalidate the sale, because in such case the purchaser cannot be presumed to have acted upon the opinion or to have placed any reliance or trust in it but is presumed to have acted on the counsels of his own judgment. This would not be the rule, however, where the seller is himself an artist, or his means of knowing the character of the property are better than those of the buyer, for the reason that in this case they do not meet on equal terms. In such case the presumption is shifted and the buyer is presumed to have acted on the superior knowledge of the seller.''

Further on (section 69) it is said than an exception to the rule that an opinion is not fraudulent arises where the vendor has peculiar means of knowledge which the vendee does not possess. Continuing he says: ''The expression of an opinion by the ven-

dor can never be made actionable, if false, unless it be so strong and based on such superior knowledge to the extent that it was relied on as true, and reasonably so by the vendee, as a fact, and known to be thus relied on by the seller.''

Applying the foregoing general pronouncements it will be found that courts generally recognize that where parties do not stand on an equal footing of opportunity and knowledge, a positive assertion of a matter, which, stated in another form, might be a mere opinion, may when false and fraudulent be actionable if the statement was a material inducement to the trade or sale. So, a statement of an opinion under like circumstances when in fact the party has no such opinion, or has a contrary opinion, may become a statement of a material fact, to-wit, the fact that an opinion exists. Take a case: Suppose A, an experienced judge of weights of cattle, tells B, an inexperienced purchaser, that his cattle in his opinion weigh a thousand pounds each when in fact A has weighed them the day before and knew to a certainty they only weighed seven hundred pounds each—if relied on, would not that false opinion be actionable if it produced a sale? So, there are cases where special confidence and trust are reposed, or where an opinion is asked for and given with the understanding it will be relied on, when falsely given and an injury results the one who reaps the benefit of the fraud may be mulcted in damages. So, if A to consummate a sale or trade refers B to C for his opinion and C's false opinion is given to B as the result of a fraudulent conspiracy or a covinous contrivance between A and C, an action may arise. And broadly where the thing (say, value) about which an opinion is expressed by a party to a trade lies at a distance and special confidence is reposed by one who is without knowledge, a false opinion expressed by the other party to the

transaction who has that knowledge or who professes
to have it, when given to be relied and is relied on as
a procuring cause of the transaction, the rule in re-
gard to opinions in cases of fraud may be somewhat
relaxed under guarded limitations—always, however,
bearing in mind that ordinarily mere opinions given
as such or mere prophesies or opinions as to what
land will produce in the future, or speculative state-
ments depending on contingencies, as whether ore in
a mine can be profitably mined in the future or is
pay ore and the like, are not actionable. Sustaining
severally those general propositions (one, one;
another, another) are many cases, not a few of them
relating to representations of value.

For example:    Scott v. Burnight, 131 Iowa, 507;
McKnight v. Thompson, 39 Neb. 752; Cressler v. Rees,
27 Neb. 515; Miner v. Medbury, 6 Wis. 295; Morgan
v. Dinges, 23 Neb. 271; Loaiza v. Court, 85 Cal. 11;
Crandall v. Parks, 152 Cal. 772; Borders v. Kattle-
man, 142 Ill. 96; Murray v. Tolman, 162 Ill. 417; Ken-
ner v. Harding, 85 Ill. 264; White v. Sutherland, 64
Ill. 181; Gordon v. Butler, 105 U. S. 553; Brown v.
Mining Co., 194 Mo. 681; Jackson v. Collins, 39 Mich.
557; Picard v. McCormick, 11 Mich. 68; Collins v.
Jackson, 54 Mich. 186; Wright v. Wright, 37 Mich.
55; Smith v. Property Corporation, L. R. 28 Ch. 7;
Haygarth v. Wearing, L. R. 12 Eq. 319 (cited with
approval by Pomeroy, supra); Cahn v. Reid, 18 Mo.
App. 115; Hoffman v. Gill, 102 Mo. App. 320; Stones
v. Richmond, 21 Mo. App. 17; Brownlee v. Hewitt,
1 Mo. App. 360; Chase v. Rusk, 90 Mo. App. 25; Ham-
lin v. Abell, 120 Mo. 188.

Under the peculiar facts of this case we are not
prepared to say it was error to introduce testimony
upon representations of value made by defendant,
or error to consider those representations in aid of
the decree.

It is argued that in no event can the decree stand as to George Stonemets. Not unmindful of that insistence, but looking into it, we are of the opinion the decree should be affirmed.

It is so ordered. All concur.