A. L. BRAGG, Respondent, v. KIRKSVILLE FARM-ERS PACKING & WAREHOUSE COMPANY, Appellant.

Kansas City Court of Appeals, December 13, 1920.

1. **FRAUD: SALE: Corporate Stock: Representation of Value.** A small packing house plant was mainly owned by individual sin the community in which it was located. An agent sold ten shares of stock for $50, cash an da note for $250, to a farmer living a few miles from' the town in which it was located who had been over the plant and who frequently sold cattle and hogs to it. He had lived in the county near the town all his life; came to it on an average once a month and had a large acquaintance there, including bankers. The agent approached him at his home and stated that the plant was incorporated with $166, 500 stock and that it ·was worth its capitalization, though it was only appraised at half that sum. He complained that the representations of value were false and fraudulent. No artifice or trick was employed to mislead him or to prevent him making inquiry as to values. He brought an action to cancel the note an recover back the $50. It was *held* that he had no right of complaint and that his bill should be dismissed.

2. **FRAUDULENT REPRESENTATIONS: Value: Equal Footing.** Representations of value are ordinarily merely opinions and are not grounds for an action for fraud to annul the contract where the parties are on equal footing and the vendee has opportunity at hand to ascertain for himself and from his own conclusion.

3. **FRAUD: Duty of Vendee: Opinions Value.** The Law repuires that a vendee on an equal footing with his vendor shall use the means of information which· he may have by reasonable effort, and if he fails to do so he has no right to complain of opinions

of value expressed by his vendor. If, having eyes, he will not see matters directly before them, he will not be entitled to consideration when he complains that he has suffered from his own voluntary blindness.

4. **EVIDENCE: Quantum of Proof.** In order to annul a contract for fraudulent misrepresentations the proof must be clear, cogent and so convincing as to leave the case without doubt.

Appeal from the Circuit Court of Adair County.—*Hon. J. A. Cooley, Judge.*

REVERSED.

*Chas. E. Murrell* and *W. F. Frank* for respondent.

*Higbee & Mills* for appellant.

ELLISON, P. J.—This is an action bottomed on fraud and deceit. On September 23, 1918, plaintiff subscribed for ten shares of stock in the defendant corporation at $30 per share, paying $50 in cash, and executing his note at sixty days for $250, in payment therefor. On December 20, 1918, he brought this action to cancel the subscription and note, and to recover the $50 cash paid. Judgment in the trial court was for plaintiff.

It may be stated by way of history leading up to the transaction involved, that the defendant company was incorporated July 16, 1918, with an authorized capital stock of $166,500, one-half of which was paid in property consisting of about 55 acres in the northwest part of the city of Kirksville, on which there had been erected a large fire proof brick building fully equipped with machinery and appliances for a packing house plant. There was also a large frame building which had been used by the Burk Brothers Meat and Provision Company, which company was incorporated in July, 1908, with an authorized capital of $20,000, one-half of which was paid up. September $30, 1909, the capital stock was increased to $70,000 for the purpose of erecting the brick building. Its assets were then valued at

$55,000 and its liabilities at $25,000. In 1910 it erected this two story fire proof brick building with basement at a cost of $28,000, and equipped it as a packing house plant. It could kill from 150 to 200 hogs and 50 cattle per day. It never had any working capital, but incurred a large indebtedness in erecting this building and installing machinery. Its name was changed to Kirksville Packing Company. It was operated in a small way on borrowed capital, always finding a ready market for its products. In 5 or 6 years it paid off its indebtedness of about $20,000. In May, 1917, a meeting of the stockholders was called to consider a resolution for the dissolution of the corporation.

In July, 1917, Mr. B. H. Stephenson acquired a controlling interest in the corporation, and he and his associates took over its management. The company had to borrow its working capital. It was unable to supply the demand for its products because it had no capital to buy live stock and adequately carry on its business. Pursuant to a resolution of the stockholders the corporation was dissolved, and the new company incorporated July 16, 1918, one purpose being to enable it to increase its capital stock. The property of the Kirksville Packing Company was taken over by the new corporation at $83,250 as appeared by the articles of association duly recorded. It was just appraised by competent appraisers. The fire proof building was appraised at $42,000, the equipment at $22,000, the 55 acres at $21,100, (one appraisement being $20,500) and an 8 or 10 room frame residence and four lots at $4,000, making a total appraisement of $85,100.

One Masterson was employed to sell the 3330 shares of capital stock at $30 per share. He employed E. J. Hayes and other agents, the purpose being to sell the stock as rapidly as possible, in blocks of ten shares to farmers in order to interest them in the enterprise. The sales began late in August, 1918, and continued until in November, when they aggregated about $22,000, on which small cash payments were made and short time notes were taken for the balance.

On September 23, Hayes sold plaintiff ten shares of stock, he paying $50 in cash and giving his note for $250. Plaintiff knew the company intended selling all of this stock to raise capital to operate the plant.

From the finding of the trial court it appears that the false representations charged against Hayes in inducing plaintiff to enter into the contract purchasing the stock were reduced down to one viz, fraudulent statements of value of the corporate property. The evidence justified the court in throwing out other causes and plaintiff in his brief joins in this view when he says: "The false representations as to value was not only one of the moving causes to plaintiff's action, but no doubt was the prime moving cause of same."

Plaintiff testified that at the time of this transaction he was 60 or 61 years old, a stock raiser, and had lived in Adair county all his life a short distance from Kirksville which was the county seat. He traded in that town and went there on an average of once a month. Besides other acquaintances, he knew all the merchants and bankers. He knew defendant's plant, frequently sold defendant or its predecessor live stock and had been through the buildings especially the killing department. The land (55 acres) on which the plant stood was in the northwest part of the town. He further testified that he and Hayes were strangers and he makes no claim to any trickery or devises to keep him from making any inquiry he liked before subscribing. It is not pretended that Hayes himself was an experienced man in the packing business or a competent judge of the value of such plants. He was merely employed by

As we have said, plaintiff knew the plant; but if he desired further information, he knew the business men of Kirksville and, of course, could have obtained it. He testified that he did not know the number of acres of land and *did not ask Hayes*.

We have only to determine whether the evidence shows a fraudulent representation of that value, as defendant to sell stock.

fendant relied upon such representations, was deceived thereby, and had a right to rely upon them under rules of equity.

In arriving at a proper judgment, it will be well to remember that when one seeks to cancel his solemn contract on account of the fraud of the other party, no half hearted, halting, evasive evidence will answer; his proof must be "so clear, definite and positive as to leave no reasonable ground for doubt." [Jackson v. Wood, 88 Mo. 76, 78.] "In general, the cancellation of an executed contract is an exertion of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear." [Cohron v. Polk, 252 Mo. 261, 281.]

Now in our view no fraud was shown. As we have said the only representations which figure in the case relate to the "amount and value of the property owned by the defendant." In showing such representations it must likewise appear that they were relied upon by plaintiff and induced him to make the contract; that he was not on equal footing with Hayes; that he did not know and had no reasonable means of ascertaining the condition or value of the plant, and with all, that they were not mere expressions of opinion. And we may here remark that running all through plaintiff's statement, brief and argument, both written and oral, is the idea that a case is made for him if a preponderance of the evidence shows that too high a value was set on the plant. We may properly say that stopping at such showing the case is not more than half made. A vital part of a case of this nature is to show that plaintiff was fraudulently imposed upon; that he was led astray, knew no better and had no means of informing himself. It must be borne in mind that this is not an ordinary case of one resisting payment for something he did not get. It is an action to annul a contract, where, as we have said the *scienter* is a main essential to be established by the most cogent proof.

On this head plaintiff testified that Hayes said the fixtures and plant and land were worth $166,500 though they were appraised at half that sum; that he, plaintiff, did not know how much the plant and land were worth, nor how much land there was and did not know the value of land, buildings or machinery, that he relied on what Hayes told him. Again he testified that Hayes told him the ''capital stock was $166,500 and was a good investment and a man couldn't lose anything.'' Again, he said ''I thought it would be a great thing for the county and for us farmers to have a packing plant•to unload our hogs and cattle, that we would have a market at home. That the reason he bought was to help out the country and himself and was not for the purpose of making money on the stock. The court asked him, ''you would have subscribed for it then regardless of what was said about the value of the stock?'' A. I don't just understand, Judge. Q. You would have subscribed anyhow, regardless of that? A. No, I don't understand what you mean by that, Judge? Q. You are claiming the value of this stock was misrepresented to you and other things misrepresented to you. You claim the value of the plant was misrepresented to you. Would you have subscribed for the stock if those misrepresentations hadn't been made to you in regard to the value of this stock, would you have bought this stock, anyhow? A. I wouldn't have bought it unless I thought it was a paying proposition to the farmers. Q. You mean to the farms generally? A. No, to the county; for all; yes, sir. Q. Was your subscription to this stock made by you because you thought it would be a good thing for the community, or was it made because of representations of the value of the plant made to you that made you think it was a good paying proposition individually? A. I can't explain it as you did, it was generally a good thing for the people, yes, sir. By his counsel; Q. Would you have subscribed for this stock if you had known they didn't have anything like the property they represented? A. No; I wouldn't. By defendants counsel; Q. You thought it would be a good

thing for the community? A. Yes, sir, for this county and all. Q. It would make a better local market? A. Yes, sir. Q. And save the losses of shipping to the markets? A. Yes. Q. You believed a packing company in Adair County would be a good thing for the community? A. Yes, sir. By his counsel; Q. You thought that would be one of the benefits that would come to Adair County and the stockholders? A. Yes, sir.''

There is nothing in this to show that Hayes practiced any fraud upon him; that he used any artifice or deception; that he in any way undertook to prevent him from ascertaining for himself. The plant itself and plaintiff's life long acquaintances—business men—were only a few miles away. Furthermore, while the record is silent, we may assume that if plaintiff did not have a telephone himself, one was conveniently near, over which he could at least have made inquiry. It is apparent that he relied upon his own knowledge of the plant which he had many times seen and where he had many times been and traded. He either had knowledge or was too listless and indifferent to care. The law will not aid him in either situation. In Dunn v. White, 63 Mo. 181, 186, the Supreme Court said: ·''And if the buyer trusts to representations which are not calculated to impose upon a man of ordinary prudence, or if he neglects the means of information easily in his reach, he must suffer the consequences of his own folly and credulity. The vendee must go further and show that some deceit was practiced for the purpose of putting him off his guard, or that special confidence was reposed in the representations of the vendor, and that the contract was made and entered into upon the strength of that confidence; and in such cases it will require clear proof of the fraudulent misrepresentations.''. In Bryan v. Hitchcock, 43 Mo. 527 (cited in Cohron v. Polk, 252 Mo. 282), we find this matter referred to. That case, like this, involved representations in the sale of corporate stock in which it was sought to annul a deed to certain lots given in exchange for the stock. The court said: ''This is considered to belong to that class of cases where, as Judge

Story says, the court will not rescind the contract of the parties 'without the clearest proof of the fraudulent misrepresentations, and that they were made under such circumstances as show that the contract was founded upon them.' [1 Sto. Eq. Jur., 199; 38 Mo. 55.] Nor will courts of equity aid parties who neglect to use their own judgment and discretion in their business transactions. It is not sufficient that Hitchcock's representations should have been inaccurate and misleading, or even willfully false. The plaintiff must have rested the transaction upon the faith of them. Now, these parties were strangers until these negotiations were initiated, and they were concluded in the course of a few days. It is a little remarkable that Mr. Ryan should have consummated the arrangement with the defendant and conveyed away his property, relying upon nothing but the interested statements and representations of one respecting whom he knew so little, and especially when other means of information were so open and accessible to him. There is an antecedent improbability that he would act so inconsiderately." The syllabus to the case correctly states the decision in these words: "In an action to annul the conveyance of certain lots of land, given in exchange for certain shares of stock, on the ground that the conveyances were obtained through false and fraudulent representations and suppressions touching the financial standing, condition, and prospects of the company, and the value of its stock; held, that a court will not rescind such a contract without the clearest proof of the fraudulent misrepresentations, and that they were made under such circumstances as show that the contract was founded upon them."

There is not the slightest proof that Hayes knew the representations made as to the value of the stock were false, and there is every reasonable inference to be drawn from the record that he was merely giving his opinion when he stated the value of the plant. The fact that when he told plaintiff the amount of stock was $166,500, he also said it had been appraised at one-half

that sum was, in effect, a warning that he was not guaranteeing values, but only stating an opinion.

Now it is held in many jurisdictions and commonly stated in text books that mere statements of value are not actionable and even if made in bad faith, they were to be regarded as "dealers talk." Massachusetts affirms the latter view (Deming v. Darling, 148 Mass. 504) and applies it even though the parties were not on equal footing. [Parker v. Moulton, 114 Mass. 99.] A complete examination of the cases in Missouri will show extreme statements either way. Some that a vendee though in possession of all his faculties, may lie limp and indolent in his credulity, and yet be allowed to occupy the time of the courts in setting up a guardianship for him. Such persons look upon the courts as children do a parent, ever watchful that they be guarded against their own behavor. But the better opinion is that the courts should encourage self-reliance and turn out those who, having no incapacity, yet apply to the court to do for them what they should have done for themselves. We said in Cahn v. Reid, 18 Mo. App. 115, that even though one loses life or limb, if it came about by his failure to care for himself he is without redress. Yet in instances involving a few dollars as against a life, some cases extend a helping hand, no matter if listless indifference and neglect have been substituted for ordiary prudence and common sense.

It is so natural for one to look with favor upon his own property, and such is his selfish desire to extol its value, that men, as far back as we know anything of them, have ever understood that it was unsafe to trust to the opinion of a seller as to the worth and virtue of his own property. And nothing is more commonly understood than that a vendee ordinarily does not and should not rely on the statements of his vendor when he makes a statement of the value of his property.

The latest discussion and ruling we have on this subject in this State is found in Stonemets v. Head, 248 Mo. 243, 262-269. In that case Judge LAMM says that "the doctrine of 'let the buyer beware' must be reckon-

ed with and that simple general commendation is allowable as puffing and dealers talk, yet there is a boundary that may not be crossed." Continuing (p. 262) he said (Italics ours) that "The right general doctrine is that where parties *without knowledge of their own, or without means of knowledge,* as for example when they reside a distance away "buying, in reliance on misrepresentations of material facts known to be false by the party making them and intended to deceive, such deceived party may have relief." At page 263, the learned Judge said: "Now there is a general doctrine of the law that ordinarily statements of opinion is not a statement of fact, a mere opinion (as for instance an estimate of *value*) cannot ordinarily form the basis of a false representation." At page 265, there is a quotation from 2 Pom. Eq. Jur., sec. 878, that general praise by a seller has always been allowed and that in order to convert such general praise into a representation upon which the buyer may rely, it must be the "positive affirmation of a *specific* fact affecting the quality, so as to be an *express warranty.*" At page 267 (bottom) it is said: "The expression of an opinion by the vendor can never be made actionable, if false, unless it be so strong and based on such superior knowledge to the extent that it was relied on as true, and reasonably so by the vendee, as a fact, and known to be thus relied on by the seller." And at bottom p. 266 there is quoted from 20 Cyc., 58, that "it is generally held that where the property involved is situated at a distant place and thus an inspection cannot be made without expense and inconvenience, and the prospective purchaser is ignorant of the facts, he may rely on the vendor's positive statements regarding the property and may hold him liable if they are false and fraudulent, even though they are representations of the value, quality, and condition of the property."

Summing up (p. 268) the Judge asserts that if the purchaser stands on an equal footing with the seller, he has no right to rely on opinions of value which the latter

may express. Furthermore that he has no such right unless it be out of the power of the purchaser, by reasonable effort, to ascertain such value for himself. A number of authorities are cited in support of these propositions, among them, are Cahn v. Reid, 18 Mo. App. 115, 127-131; Stones v. Richmond, 21 Mo. App. 17; Chase v. Rusk, 90 Mo. App. 25; in which cases it is distinctly stated that to enable a vendee to maintain an action based on fraudulent representations as to value, he must have stood upon an unequal footing with the vendor and must have been in such situation that he could not reasonably have ascertained for himself.

The Supreme Court of the United States (Slaughter v. Gerson, 13 Wall. 379) has so plainly stated the view of our supreme court and the courts of appeals to which we have referred, that we transcribe two paragraphs as bearing directly upon the evidence in the present case; "Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been mislead by overconfidence in the statements of another." Further on, at p. 385, the court said: "Where the means of information are at hand and equally open to both parties, and no concealment is made or attempted, the language of the cases is, that the misrepresentation furnishes no ground for a court of equity to refuse to enforce the contract of the parties. The neglect of the purchaser to avail himself, in all such cases, of the means of information, whether attributable to his indolence or credulity, takes from him all just claim for relief."

Plaintiff has cited us to Judd v. Walker, 215 Mo. 313. The case is not like this, indeed what is said at

page 337, 338 of the report of that case supports our conclusion in this.   But if the case were against the views we have set forth, we would be compelled to follow the latter one of Stonemets v. Head, supra.

Applying the foregoing statements of the law to the evidence we have herein set out, it leaves plaintiff without a right to the relief he has sought.   The judgment should therefore be reversed.   *Trimble, J.,* concurs; *Bland, J.,* in the result.