Austin V. STORY and Winnie Story,
Plaintiffs,

v.

R. L. NELSON and Pauline Nelson,
Defendants.

Civ. A. No. 493.

United States District Court
W. D. Arkansas,
Harrison Division.
Dec. 21, 1962.
As Amended Jan. 2, 1963.

Norman R. Jones, Kansas City, Mo., Griffin Smith, Little Rock, Ark., for plaintiffs.

Neale, Newman, Bradshaw, Freeman & Neale, Springfield, Mo., Virgil Willis, Harrison, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

On February 27, 1962, plaintiffs, Austin V. Story and wife, Winnie Story, filed their complaint against the defendants, R. L. Nelson and Pauline Nelson, in which they alleged that on April 10, 1960, they were the owners of a farm of 535 acres located in Cedar County, Missouri. The defendants were owners of real and personal property, consisting of a motel, cafe, liquor store, service station and garage, located in Anderson, McDonald County, Missouri.

That the parties agreed to exchange properties, each to assume outstanding existing indebtedness on the property being exchanged. Plaintiffs' property was subject to a lien of two deeds of trust, totaling $21,000.00; that the value of plaintiffs' property was $59,000.00 and the equity conveyed was of the value of $38,000.00; that defendants represented the value of their property to be $65,000.00 subject to a lien of $12,847.08 held by the Bank of Bentonville, Bentonville, Arkansas.

On April 10, 1960, the plaintiffs executed, acknowledged and delivered a warranty deed conveying their farm in Cedar County, Missouri, to the defendants for a

recited consideration of $1.00 and other considerations; that as a consideration for the execution and delivery of the deed by plaintiffs, the defendant, R. L. Nelson, made representations to the plaintiffs as an inducement to the transaction, which were false, known by defendants to be false, material to the transaction, were intended to deceive plaintiffs, and were relied upon and acted upon by plaintiffs to their damage. The representations alleged to have been made by defendants are stated in the complaint as follows:

"(a) That the premises were fairly worth $65,000;

"(b) That, predicated on actual history of operation, the filling station alone, when opened, would produce a net profit of $800 per month;

"(c) That the motel-cafe operation, because of good location at highway intersects, was as productive of income in winter as in summer;

"(d) The installation had produced a minimum of $15,000 net profit in 1959;

"(e) The wholesale value of the liquor stock inventory was $3750;

"(f) Defendant R. L. Nelson would immediately transfer ownership and license rights to sell the liquor so that plaintiffs could use the proceeds as operating capital;

"(g) All equipment was in good condition and good working order;

"(h) That the Bank of Bentonville would accept interest payments and $275 per month installments;

"(i) That all the personal property in Exhibit 'C' was on the premises."

The plaintiffs further alleged that the representations made by the defendant, R. L. Nelson, were false in that the earnings from the operation of the property did not include $800 per month; that the income was materially less in winter; that no profit had been realized in the 1959 operations; the value of the liquor was only $2,000; and that the defendant Nelson refused to transfer the stock in Bel-Air Corporation which held title to the liquor to the plaintiffs, and refused to transfer the license, thus preventing the plaintiffs from disposing of the liquor stock; that a material portion of the personal property was not on the premises, and much that was there was not in operating condition; and that the entire balance on the mortgage held by the Bank of Bentonville was scheduled to come due February 4, 1962.

That the defendant Nelson was well aware that plaintiff, Winnie Story, purchased the property for the purpose of operating it, and that she had limited capital; that he knew it was essential that she dispose of the liquor stock immediately to secure operating capital, but notwithstanding this knowledge on the part of the defendant Nelson, he refused to make it possible for the plaintiff, Winnie Story, to legally dispose of the liquor inventory.

The prayer of the complaint is that the deed executed by plaintiffs to defendants conveying the Cedar County farm be canceled, and that they recover as actual damages the sum of $4,244.00, "being the difference between the rental value of their property, of which they have been deprived by defendants' fraud, and $1,000 per year payment on the deeds of trust thereon."

In due time the defendants filed their answer in which they denied that the value of the farm property was $59,-000.00 and that the equity of plaintiffs therein was of the value of $38,000.00.

No direct denial is made in the answer to the allegations of fraud contained in plaintiffs' complaint, although the allegations are not admitted. In numbered paragraph 7 of the answer the defendants "state and allege, with respect to each count thereof, that said complaint

fails to state a claim upon which relief can be granted."

In the counterclaim filed by defendants they seek to recover from the plaintiff, Winnie Story, $5,000.00 damages for the alleged removal by said plaintiff of certain personal property.

Upon the issues as joined, the cause proceeded to trial to the court on November 13, 1962, and at the conclusion of the presentation of the evidence, the case was submitted with the request that the attorneys for the respective parties file briefs in support of their contentions. The briefs have been received and considered along with all the pleadings, interrogatories, answers thereto, and the evidence and exhibits thereto.

The evidence introduced by the parties establish that the plaintiffs purchased the land in October, 1958, from one Petty. As a consideration, the plaintiffs assumed a deed of trust in the amount of $20,-000.00, dated November 1, 1957, in favor of Mrs. Maggie Bridges, and executed a second mortgage in the amount of $5,-000.00 payable to Petty to secure the payment of the balance of the purchase price to Petty. Prior to the time the plaintiffs purchased the land, a man named Jobe had purchased it on September 1, 1957, for $23,000.00, and in October, 1957, sold it to Petty, the grantor of plaintiffs. As of April, 1960, the total mortgage indebtedness against the land was $21,000.00, exclusive of interest.

The plaintiff, Austin V. Story, was the owner of certain property in the vicinity of Odessa, Texas, and apparently devoted most of his time to looking after that property. The plaintiff, Winnie Story, had charge of the Missouri land while her husband looked after the property in Texas. She moved into the Nine Wonders Motel at El Dorado Springs, Missouri, to remain during the winter months. Her husband would occasionally visit her when his business in Texas did not require all of his time, and during the latter part of March, 1960, the plaintiff, Austin V. Story, and his wife were in their rooms at the Nine Wonders Motel when, without notice or warning, a son of the plaintiff, Winnie Story, by a former marriage, rushed into their living quarters, armed with a deadly weapon, and threatened to kill both of them because of some act which he claimed the plaintiff, Austin V. Story, had committed while in Odessa, Texas, which completely disrupted and destroyed the felicity of his married life. Through the intercession of the plaintiff, Winnie Story, the threats were not executed and her son departed, taking with him $500 in money which he took from its resting place on the table in their quarters, and an automobile of the plaintiffs without their consent. The matter was reported to the law enforcement officers, and the son was arrested and placed in jail in Stockton, the county seat of Cedar County. The plaintiff mother of the young man was very much concerned and emotionally disturbed by the occurrence, and the subsequent arrest and imprisonment of her son. Austin V. Story immediately departed for Odessa, Texas. In order to procure the release of her son from prison, the plaintiff, Winnie Story, made some arrangement with the Prosecuting Attorney whereby she deposited the deed to the farm as security for an appearance bond. In addition to the incident above referred to, it appears to a reasonable certainty that the plaintiff, Mrs. Story, had been having some other difficulties allegedly caused by the excessive use of intoxicating liquors. She had been arrested on one or more occasions, either for disturbing the peace, intoxication, or kindred acts.

Prior to the happening of these events, Mrs. Story had become acquainted with Clair Sauter, the operator of the Nine Wonders Motel, who was also a real estate salesman for Maddux Realty Company, and she learned that Sauter's employer had the listing of some motels for sale or trade in various places owned by the defendant, R. L. Nelson. Among the listings was a motel in Springfield, Missouri. Accompanied by Sauter, Mrs. Story went to Springfield, Missouri, where she met Nelson in the latter part

of March, 1960. She looked at the motel in Springfield owned by Nelson, but it did not appeal to her. At that time she did not discuss the Bel-Air Motel in Anderson, Missouri, with Mr. Nelson, but she, accompanied by Sauter and "Dink" Thompson, one of her hired hands from the farm, went to Anderson to examine the Bel-Air Motel. There they found that the motel, cafe, filling station, garage and liquor store had been closed since July, 1959, but she obtained the keys from J. B. Parvin, a Deputy Sheriff living in Anderson and who was employed by Nelson to watch the property. Mrs. Story spent approximately 30 minutes there at that time, but she saw only the restaurant. She made no examination of the motel rooms, the service station, or the garage, and could not enter the liquor store because Mr. Parvin did not have the key.

On March 20, 1960, Mrs. Story, at the request of Mr. Nelson, met him in Springfield for the purpose of accompanying him to Anderson to view the property. Mrs. Story went with Nelson from Springfield, while Thompson, who was driving for Mrs. Story, followed in Mrs. Story's automobile. During that visit to Anderson Mrs. Story casually examined three of the motel rooms and again viewed the service station, restaurant, garage, and looked at the liquor store. Mrs. Story and Nelson discussed the financial potentialities of the motel and other businesses, and Nelson stated that even with poor management of the motel business, they had netted him a $15,000 profit during the year he operated it from July 1958 to July 1959. He stated that the properties were worth $65,000, and that the service station alone could produce a net profit of $800 per month; that the total liquor inventory amounted to $3,750.00, of which the liquid inventory was $3,200.00 at wholesale prices, which Mrs. Story could sell to the distributor and obtain operating capital; that everything in the motel and its other businesses was in working order. Mrs. Story did not make an inventory of any of the property nor of the liquor stock. Nelson did not inform her that the liquor store and the license for its operation were owned and in the name of Bel-Air, Inc., a corporation of which he was a majority stockholder.

Prior to the trip of Mrs. Story and the defendant Nelson to Anderson, Missouri, when he made the representations above referred to, he had investigated the farm owned by plaintiffs. After the visit by Mrs. Story to the property at Anderson, Missouri, Nelson reiterated his statements about his property. They discussed the terms of the exchange of properties and an undated conditional sales contract was executed by the plaintiff, Mrs. Story, and by the defendants, Nelson and wife. By the terms of the conditional sales contract, the defendants agreed to convey the Anderson, Missouri, property to the plaintiff Mrs. Story for a total sum of $55,500.00. The contract recites that Mrs. Story agreed to furnish an abstract of title to the farm, reflecting a merchantable title as of the date of the contract, and to assume "an indebtedness of $12,847.88 payable to the Bank of Bentonville, Bentonville, Arkansas, payable in the amount of $275.00 plus interest on the 4th day of each month until principal and interest are paid in accordance with the terms of said debt.

"Interest on the remainder of $42,652.-12 to be paid quarterly for the first six months; then $100.00 per month plus interest until the said bank loan is paid in full, then and thereafter $200.00 plus interest monthly until the purchase price and interest are paid in full."

The contract further provides that Mrs. Story should not violate any of the terms of the contract, and only upon full completion and final payment of the consideration would a deed to the Anderson property be delivered to her. The contract further provided:

"Should Buyer [Mrs. Story], from any cause, violate any, all or either of the terms or conditions or fail, refuse or neglect to make either,

any or all of the payments as herein provided, then in either event the Seller [Nelson] may at Seller's option terminate the contract without notice or process of law, take immediate possession of the property and retain any and all payments made as rents and liquidated damages * * *."

The evidence did not show when the conditional sales contract was executed, but evidently it was executed prior to April 5, 1960, because it provided that Mrs. Story should have possession of the Anderson, Missouri, property on April 5, 1960, and on April 2, 1960, the defendant Nelson called on Mrs. Story at El Dorado Springs and they proceeded to Stockton, Missouri, to close the transaction. However, it developed that the deed could not be executed by Mrs. Story at that time without authorization from the Magistrate and the Prosecuting Attorney, since she had deposited her title paper to the land with the officials as security on the appearance bond of her son, heretofore referred to. Apparently this was the first information that the defendant Nelson had received to the effect that Mrs. Story had pledged the deed as such security. However, he was very anxious to close the deal and he obtained the signatures of two resident businessmen on an appearance bond for Mrs. Story's son. Even when that had been done, the Prosecuting Attorney refused to release the deed to Mrs. Story until she paid him $500.00 in settlement of a civil claim that had been brought against her by one of the Prosecuting Attorney's clients. Mrs. Story did not have the money, and the defendant Nelson very promptly agreed to loan her the amount of $500.00 in order that she might obtain a release of the title papers to the lands. The deed was prepared and forwarded to the plaintiff, Austin V. Story, in Texas to be executed by him, but apparently the acknowledgment was not executed at the time he signed the deed in Texas, and when it was returned unacknowledged, Nelson immediately contacted Mrs. Story and asked her to have her husband meet them at Joplin, Missouri, on April 11, and at that time she could execute the deed and the deed could also be acknowledged by her husband. The arrangement was carried out, and on April 11, 1960, Mr. Nelson and Mrs. Story picked up Mr. Story on the highway between Joplin and Webb City, Missouri. Mr. Story entered the automobile, and while Nelson was driving to the office of a notary public to take the acknowledgment to the deed, he, Mr. Story, discussed the terms of the trade with Nelson and Mrs. Story. At that time Mrs. Story, in the presence of the defendant Nelson, reiterated the representations heretofore set forth, and upon Mr. Story's expressing a doubt as to the truth of all the representations, or for that matter any of them, he was assured by Mrs. Story in the presence of the defendant Nelson that if things were not as represented that he would "make them good." Thereupon the deed was acknowledged on April 11, 1960, before a notary public of Jasper County, Missouri, and was filed for record by Nelson and recorded in the Deed Records of Cedar County, Missouri, the next day, April 12, 1960.

Mrs. Story, accompanied by Nolen L. (Dink) Thompson and his wife, Mrs. Iris Thompson, took possession of the Anderson property either on the 5th of April or shortly thereafter. At the time the conditional sales contract was executed, Mrs. Story asked Mr. Nelson to see the books that he had kept on the motel operations. He stated that they were in Berryville, Arkansas, but that he would bring them to Mrs. Story at Anderson when she took possession. However, he never did produce any books or tax returns.

While the plaintiffs and Nelson were in the automobile going to the notary public's office, Mrs. Story advised Mr. Nelson that not all of the personal property listed in the conditional sales contract was on the property and that the plumbing was out of order, and that it

would be necessary that considerable money be expended to replace the missing property and to repair the plumbing. Nelson stated that as soon as the deed was acknowledged he would replace all missing property, and that he would do whatever was necessary to put the property in a good operating condition.

Following the acknowledgment of the deed, the plaintiffs returned to the property at Anderson, Missouri, and at the insistence of Mr. Story an inventory of the contents of the motel and businesses was taken, which disclosed, among other things, that the air conditioner in the liquor store was missing; four air conditioners in motel rooms were missing; certain tools in the service station could not be found; and other appliances, utensils and linens were likewise missing.

Mrs. Story leased the service station and garage. She had intended that Thompson should operate the liquor store and that Mrs. Thompson would assist her in the operation of the motel and restaurant, but when Nelson did not return and have the plumbing repaired and the missing personal property replaced, Mrs. Story proceeded to have the plumbing work done at a total expense of $600.00. She also repaired two toilet tanks, three hot water heaters, and cleaned the septic tank.

Three days after Mrs. Story took possession of the property, the liquor stock was inventoried at its wholesale value by a member of the Liquor Control Board of Missouri. The person making the inventory was not produced as a witness. The court permitted Mrs. Story to testify as to what the inventory showed, but has concluded that the testimony was not admissible and it is not considered by the court. However, after the inventory was made, Mrs. Story contacted wholesale liquor distributors in an effort to sell the liquor stock to them, but she was advised that she needed a special license to do so. She attempted to get a license, and learned for the first time that the license was in the name of Bel-Air, Inc., and ran from December 15, 1958, to July 1, 1959. Then Mrs. Story contacted Mr. Nelson and he advised her that the liquor licenses run from July 1 to June 30, and that it would be a waste of money to take out a new license for only a month or two, but that if she would wait until July 1, one could be obtained for a whole year.

Nelson made other propositions to her about trying to work out some arrangement whereby she could sell the liquor but did nothing to facilitate the transfer of the ownership of the liquor stock from Bel-Air, Inc., to Mrs. Story. Later, after Mrs. Story abandoned the property, a liquor license was issued to "Mose's Package Store on 71, Inc."

Notwithstanding the plaintiff, Mrs. Story, was short of funds and was unable to realize anything from the sale of the liquor, she did succeed in opening a restaurant, but was never able to put all of the motel in operation. The plaintiff never received any proceeds above expenses from the operations. The Thompsons, who had gone to the property with Mrs. Story, moved away on June 27, 1960, and on July 2, 1960, Mrs. Story received notice from the electric company that if she did not put up a deposit of $125.00, that the electricity would be cut off. When she received this notice, she closed the restaurant and other property, packed her clothes and moved out. Apparently Mrs. Story removed a portion of the personal property that was in the motel, or at least instructed her attorney to remove and store her personal belongings and furniture. That was done, and such property as she removed, including her own, was placed in storage and later sold for storage costs.

Soon after Mrs. Story moved from the property, she caused a suit to be filed to set aside the deed to the farm against the present defendants in the Circuit Court of McDonald County, Missouri. A copy of the petition filed by the plaintiffs through their attorney, Robert E. Yocum of Pineville, Missouri, was introduced in evidence, but it does not disclose the date that the suit was filed. The defend-

ants contend that there is a substantial and material difference in the allegations contained in the Missouri suit and in the instant suit, but an examination and comparison of the complaint in the instant suit with the copy of the petition filed in Missouri do not disclose substantial differences in the contentions made in the Missouri suit and the contentions made in the instant suit.

Mrs. Story made no payments on the mortgage indebtedness and, as heretofore stated, she left Anderson, Missouri, on July 2, 1960. The Bank of Bentonville foreclosed its mortgage on July 27, 1960. The record does not disclose whether the mortgage or deed of trust was foreclosed under the power contained therein, or whether it was foreclosed by a proceeding in court. Neither does the record disclose when the sale was had, but the suit in McDonald County, Missouri, was pending at that time, and Mr. Nelson, in order to prevent service of summons issued out of the Circuit Court of McDonald County, Missouri, upon him, sent a man named Holtzman to Missouri to purchase the property for him, which Mr. Holtzman did, but apparently, after paying the Bank of Bentonville the amount of its debt, Holtzman left Missouri without accounting to Nelson for the difference between the purchase price at the mortgage sale and the indebtedness due the bank. Later Nelson, through litigation with Mr. Holtzman succeeded in obtaining a settlement with him and regained possession of and title to all of the Anderson, Missouri, property.

Not being able to obtain service of summons on the defendants, the suit in Missouri was withdrawn or dismissed and the instant suit was commenced.

The court is convinced that during the time the negotiations were being conducted, Mrs. Story was very depressed and desired to leave Cedar County, Missouri. The defendant Nelson was fully aware of her depressed mental condition and the trouble that she had been having with various persons, including law enforcement officers. She was suspected of using alcoholic liquors to excess, and Mr. Nelson took advantage of the situation in the negotiations for the exchange of properties. The court is convinced from all of the testimony and the circumstances existing during such period, that the defendant, R. L. Nelson, made the representations that the property had produced a net profit of $15,000 during 1959; that she could realize the same income from the operation of the property; that the wholesale value of the liquor stock inventory was $3,750; that he would immediately transfer the ownership of license rights to sell the liquor so that Mrs. Story could use the proceeds as operating capital; that all equipment was in good condition and good working order, and that all of the personal property mentioned in the conditional contract of sale was on the premises.

These representations were made as an inducement for Mrs. Story to enter into the transaction. They were relied upon by her, and were materially false in that the proceeds from the operation of the property would not even approach $15,000 net or $800 a month, or any other substantial sum. The equipment was not in good condition and the businesses were not in operable condition.

Mrs. Story inspected some of the property before she took possession of it, but she could not see and did not know about the plumbing in the cabins or on the property, and had no idea that the property was not in an operable condition notwithstanding it had been closed since July 1959, or approximately one year.

Mrs. Story in her testimony submitted a list of items of personal property that were not on the premises and which the contract stated were on the property, but the court is not itemizing the property for the reason that the other statements and representations made to her were, in the opinion of the court, fraudulent and untrue.

The defendant went into immediate possession of the farm land, and up to the date of the trial had expended on the

indebtedness assumed by him and for taxes and insurance the following sums:

Paid on first deed of trust—
principal $2,500.00
Paid on first deed of trust—
interest 1,875.00
Paid entire amount due on second deed of trust. (The holder of this deed of trust deducted $500.00 from the principal and agreed to accept $4,500.00 as full payment on the principal.) 4,500.00
Paid on second deed of trust
—interest 339.87
Real estate taxes, 1960 437.87
Real estate taxes, 1961 437.87
Real estate taxes, 1962 437.87
Insurance on improvements 70.20
$10,598.68

The defendants received as Soil Bank payments for each of the years 1960, 1961 and 1962 the sum of $3,120.00, or a total of $9,360.00, which, deducted from the expenditures made by the defendants, leaves the net sum of $1,238.68.

There was no evidence introduced by the plaintiffs or the defendants as to the rental value of the farm land or of the motel properties.

The plaintiffs are citizens of the State of Missouri, and the defendants are citizens of the State of Arkansas. The amount in controversy exceed $10,000, exclusive of interest and costs.

All transactions under consideration occurred in Missouri, and the properties involved are situated in Missouri; therefore the substantive law of Missouri governs the rights of the parties.

The issue in the present case is whether under the facts as heretofore set forth the plaintiffs are entitled to a rescission due to fraud, misrepresentation, or concealment on the part of defendant Nelson of the conveyance of their farm to the defendants as part consideration for the purchase of defendants' Bel-Air Motel property.

The general rule is stated in 9 Am. Jur., Cancellation of Instruments, Sec. 21, as follows:

"The jurisdiction of equity to decree cancellation or rescission of a contract or conveyance for fraud or misrepresentation constituting an inducement to its execution, and on which the injured person had the right to rely, is well recognized, especially where such representations are peculiarly within the knowledge of the party making them. * * *

"As in any case where relief is asked against fraud, a fraudulent representation which will avoid a contract or a deed must be of an existing, material fact constituting an inducement or motive to the act or omission of the plaintiff, by which he is deceived and misled to his injury. That is, it must be in regard to something in relation to which the plaintiff places a known trust and confidence in the other, and not a mere matter of opinion, equally open to both parties, where neither is presumed to trust the other."

This rule includes misrepresentations as to past net profits and income, and is stated in the case of Bertram v. Kempster (Mo.1949), 216 S.W.2d 494, beginning at page 497, as follows:

" * * * If the representations of net profits were made, it could be reasonably considered the consummation of the transaction was under such circumstances that defendants should have known plaintiffs were relying upon the representations. Defendants' false statements, if made, of the amounts of their past or present profits or income from the property or the productiveness of the property or business were statements of existing facts peculiarly within defendants' knowledge— existing facts about which defendants were informed and about which plaintiffs knew nothing. See Wendell v. Ozark Orchard Co., Mo.App., 200 S.W. 747; Goar v. Belinder, 213

Mo.App. 330, 249 S.W. 977; 9 Am. Jur., Cancellation of Instruments, § 21, pp. 366–368; 23 Am.Jur., Fraud and Deceit, § 68, p. 841; and compare Messina v. Greubel, supra [358 Mo. 439, 215 S.W.2d 456]."

See, also, Strafer v. Bodney (Mo.1952), 247 S.W.2d 630.

■ However, an expression of opinion, accompanied by other matters going to establish misrepresentation, imposition, undue confidence, mental inability, surprise, and the like, especially when there is a fiduciary relation between the parties, may amount to fraud justifying the rescission of a contract induced thereby. 9 Am.Jur., Cancellation of Instruments, Sec. 21. This exception to the general rule is stated in the case of Finke v. Boyer (1932), 331 Mo. 1242, 56 S.W.2d 372, as follows, beginning at page 375:

"The cornerstone of the doctrine of fraud is that the statement alleged to be a material misrepresentation must be an affirmation of fact. Expressions as to the values sometimes may be opinions and again they may be statements of fact. Stonemets v. Head, 248 Mo. 243, 154 S.W. 108, a case arising out of misrepresentations of the value of traded land, makes an enlighted examination of the question of opinions and facts in actions for fraud. Pomeroy (2 Pom.Eq.Juris. (35th Ed.) § 878) is quoted at length. The following paragraph is in point [154 S.W. loc. cit. 114]: 'There is still another and perhaps more common form of such misrepresentation. Wherever a party states a matter, which might otherwise be only an opinion, and does not state it as the mere expression of his own opinion, but affirms it as an existing fact material to the transaction, so that the other party may reasonably treat it as a fact, and rely and act upon it as such, then the statement clearly becomes an affirmation of fact within the meaning of the general rule, and may

be a fraudulent misrepresentation. The statements which most frequently come with this branch of the rule are those concerning value.' "

The situations in which this exception is applicable are stated in the case of Long v. Freeman (1934), 228 Mo.App. 1002, 69 S.W.2d 973, at page 975 as follows:

"The general rule is that representations as to the value of property do not ordinarily constitute fraud, but are regarded as mere expressions of opinion. [Citing cases.] That rule, however, does not apply when the parties are not upon an equal footing. Generally speaking, if property lies at a distance, or from its character, situation, and surroundings one party is unable to judge of its value, and the other party is well acquainted with the property and its value or pretends to be, the party to whom representations as to value are made by the other party in a position to know may rely upon such representations of value. * * *"

This exception also applies to opinions as to future profits in certain circumstances. In this connection the court stated in the case of Wendell v. Ozark Orchard Co. (Mo.App.1917), 200 S.W. 747, at page 749, as follows:

"It is claimed that these representations as to the productiveness of the peach orchard and the enhanced value of this land because of its being fruit land were mere matters of opinion and related to future events rather than to existing facts, and therefore do not sustain allegations of fraud. It will be found, however, that false representations and promises as to what will result in the future, when made by one having or professing to have superior knowledge based on past experience of himself or others, are in effect false representations of existing conditions and support allegations of fraud. * * * Even representations of value often afford a solid

basis for actionable fraud. What is said in Stonemets v. Head, 248 Mo. 243, 253, 255, 154 S.W. 108, will be sufficient on this point."

The defendants have cited the case of Meyer v. Brown (Mo.App.1958), 312 S. W.2d 158, for the proposition that two of the necessary elements of fraud that must be proven in the present case are the speaker's knowledge of a representation's falsity or ignorance of its truth and his intent that it should be acted upon by the hearer and in the manner reasonably contemplated. However, the Meyer case, supra, was an action at law for damages, and it is held immaterial, in an equitable suit for rescission or cancellation of a contract or conveyance as in the instant case, whether the false representation inducing its execution was made with knowledge of its falsity or in an honest belief that it was true. 21 Am.Jur., Cancellation of Instruments, Sec. 21. As stated by the court in the case of Ellenburg v. Edward K. Love Realty Co. (1933), 332 Mo. 766, 59 S.W. 2d 625, at page 627:

"Appellant's contention overlooks the distinction between a case of actual fraud and one of constructive fraud. In actions at law to recover damages for fraud and deceit, it must be shown that false representations were made, with knowledge of their falsity and with a fraudulent intent, but where, as in the case at bar, an action in equity is brought to rescind a contract on the ground that it was induced by fraudulent representations, it is not necessary to show that the party making the fraudulent representations knew of their falsity, or made them with an intend to cheat and defraud. The distinction between the two classes of cases is clearly pointed out in 12 R.C.L. p. 345, § 100. It is there said: 'False representations which are made with knowledge of their falsity, and with a fraudulent intent, are, of course, ground for relief in equity as well as at law. As a general rule, however, courts of equity will grant relief in such cases, by way of rescission or otherwise, even though no fraudulent intent on the part of the person making the representation is shown, and though he made them innocently, as a result of misapprehension or mistake. All that need be shown under such circumstances is that the representations were false and actually misled the person to whom they were made. The reason generally given for the rule is that courts of equity may grant relief on the ground of constructive fraud such as would not authorize relief by way of an action of deceit at law.' "

See, also, O'Hanlon v. Grand Nat. Co. (Mo.App.1936), 89 S.W.2d 79.

The general rule setting forth the duty of the plaintiff is stated in 9 Am. Jur., Cancellation of Instruments, Sec. 21, as follows:

"* * * If, however, the plaintiff had actual knowledge of the facts constituting the fraud, or if he placed no reliance upon the false representations, but relied upon his own judgment or investigation, there is no ground for cancelation. Thus, if a purchaser of real estate or his agent makes an actual examination of the premises, it is generally held that he is precluded from suing to rescind the contract on the ground of false representations, unless it can be shown that the conditions or circumstances were such that the examination was only cursory or incomplete, so that the purchaser could not reasonably ascertain the true condition, extent, or value of the property, and was forced to rely largely upon the vendor's representations."

The Missouri Supreme Court has held that the duty of the purchaser to inspect does not apply where the defects are latent, are not readily discoverable, or are not such as would be encompassed by the doctrine of caveat emptor. In the case of Meyer v. Brown, supra, the

court made the following statement, at page 161 of 312 S.W.2d:

" * * * 'However, the mere presence of opportunities for investigation will not of itself preclude the right of reliance; and this is especially true where the circumstances were such that a prudent man would not have been put on inquiry, as were positive statements were made in a manner not calculated to cause inquiry, where the relations between the parties were involuntary, where, although it was possible to ascertain the facts, an investigation would have been difficult, or where there was intentional fraud, as where the representations were made for the very purpose of preventing inquiry; * * *.

" 'The right to rely on representations is generally conceded where the hearer lacks equal facilities for ascertaining the truth, as where the facts are peculiarly within the knowledge of the speaker and are difficult for the hearer to ascertain, as where misrepresentations relate to latent defects, where because of the hearer's ignorance and inexperience, it would be necessary for him to employ a third person to make an examination in order to learn the truth, where the employment of an expert would be required, or where from the circumstances attending the transaction the hearer is compelled to rely on the speaker's statements'."

The rationale of such a rule is stated in the case of Bertram v. Kempster, supra, as follows, at page 496 of 216 S.W.2d:

" 'Fraud is a willful, malevolent act, directed to perpetrating a wrong to the rights of another. That such an act in a vendor should not be actionable because of the mere negligence or inadvertence of the vendee in preventing the fraud ought to be neither good ethics nor good law. If one voluntarily shuts his eyes when to open them is to see, such a one is guilty of an act of folly (in dealing at arm's length with another) to his own injury; and the affairs of men could not go on if courts were being called upon to rip up transactions of that sort. * * * But when an element of willful deception leads up to a transaction, the whole situation changes.' Judd v. Walker, 215 Mo. 312 at pages 337 and 338, 114 S.W. 979 at page 980. Hence, in an action for fraud, it is misleading to say the evidence must show fraud *plus* absence of negligence. And it is a misnomer to use the word 'negligence' in this connection if it is understood as carrying its usual signification, because 'the law of fraud does not exact of the victim that degree of caution which some other hypothetically prudent person would have used, but only reasonable care in view of *his* situation. * * * The snares of the fraud-feasor are most often set for the incompetent, the ignorant, and the unwary.' State ex rel. Union Pac. R. Co. v. Bland, supra [324 Mo. 601, 23 S.W.2d 1029]. And see the recent case, Messina v. Greubel, [358] Mo. [439] Sup., 215 S.W.2d 456."

See, also, Wallo v. Rosenberg (Mo.App. 1960), 331 S.W.2d 8; and Goar v. Belinder (1923), 213 Mo.App. 330, 249 S.W. 977.

The conclusion of the court's opinion in the case of Wendell v. Ozark Orchard Co., supra, aptly characterizes the caliber of Mrs. Story as a purchaser in the instant case and the judicial duty to protect her interests, if all possible, under the law. The court stated as follows at page 750 of 200 S.W.:

" * * * The plaintiff certainly showed himself an easy mark for the land agent, who pictured the possible profits without mentioning the almost certain expenses and losses. The plaintiff counted his eggs as full-grown chickens. That

he did not act as a reasonably prudent man should, or even with ordinary business sagacity, may be true. Just when and to what extent the courts should act as guardian for the ignorant and imprudent is a nice question, and each case must stand on its own facts. Just where the plaintiff has been so far overreached and made a victim of his own folly as to warrant relief in a court of conscience depends to an extent upon the man as well as on the facts constituting the fraud. To say that the ignorant and imprudent must always act with reasonable prudence is requiring the impossible."

Upon the consideration of the applicable law to the facts as found by the court and hereinbefore set forth, the court is of the opinion that the defendant, Nelson, made misrepresentations as to material facts upon which the plaintiffs had the right to rely as inducement to convey their farm and by which they were misled to their detriment; that the plaintiffs are thereby entitled to a cancellation of the general warranty deed executed by them and the revesting of the title to the land therein described, subject to the payment by them to the defendants of the sum of $1,238.68 with interest thereon at 6 percent per annum from the date of the entry of the decree herein; and that the counterclaim of the defendants against the plaintiffs should be dismissed.

Therefore, judgment is being entered today annulling, setting aside and holding for naught the general warranty deed dated April 5, 1960, acknowledged by the plaintiffs on April 11, 1960, and recorded on April 12, 1960, at 11:50 a. m. in the office of the Circuit Clerk and Recorder of Deeds of Cedar County, Missouri, and revesting the title in the plaintiffs or their assigns of the land therein described, to-wit:

"All the North Three Fourth of the Northeast Quarter (N¾ NE¼) and North Twenty (20) Acres of the East Three Eighth of East Half of the Northwest Quarter (E⅜ E½ NW¼) of Section Eight (8), also "All the Northwest Quarter (NW¼) Except that part of the East Half of Northwest Quarter (E½ NW¼) lying South of Horse Creek and all the North Half of the Northeast Quarter (N½ NE¼) lying West of Horse Creek in Section Nine (9), also

"The South Half of the Southeast Quarter (S½ SE¼) lying West of Horse Creek in Section Four (4), also

"The East Half (E½) of Lot One (1) of the Northwest Quarter (NW¼) and the East Half of the Southwest Quarter (E½ SW¼) and West Half of Southeast Quarter (W½ SE¼) and the West Half of the West Half (W½ W½) of Lot One (1) of the Northeast Quarter (NE¼) of Section Five (5).

"All the above being in Township Thirty Four (34), Range Twenty Eight (28), west of the 5th P.M. containing 535 acres more or less."

That the defendants recover said sum of $1,238.68 plus interest from the date of entry of this decree from plaintiffs, and defendants have a lien upon said land to secure the payment of said sum, which if not paid within ninety days from the date hereof, the defendants may proceed under the applicable provisions of Missouri law to sell said land subject, however, to the indebtedness secured by mortgage or deed of trust dated November 1, 1957, in favor of Mrs. Maggie Bridges; and that the plaintiffs recover of and from the defendants their costs paid out and expended.